**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee*,

                    v.

JACK HOLDEN,
            *Defendant-Appellant.*

No. 16-30186

D.C. No.
3:13-cr-00444-BR-2

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted June 8, 2018
Portland, Oregon

Filed July 26, 2018
Amended October 30, 2018

Before:  Susan P. Graber and Milan D. Smith, Jr., Circuit
Judges, and Edward R. Korman,[*] District Judge.

Order;
Opinion by Judge Graber

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel amended an opinion filed July 26, 2018, and denied a petition for rehearing, in a case in which the panel affirmed the defendant's convictions for mail and wire fraud, conspiracy to commit mail and wire fraud, and money laundering; vacated his custodial sentence and the restitution portion of the judgment; and remanded for further proceedings.

Assuming without deciding that the defendant's argument to the contrary is not foreclosed by precedent, the panel held that this court's caselaw that "participating" in a scheme to defraud is forbidden by the mail and wire fraud statutes does not amount to the creation of a common-law crime in violation of separation-of-powers principles, and that the district court therefore did not err by instructing the jury that it could find the defendant guilty for "participating in" a scheme to defraud.

The panel vacated the custodial sentence because the record does not support the district court's conclusion that the defendant exercised sufficient control or organizational authority over his co-conspirator to qualify for a two-level "organizer" enhancement under U.S.S.G. § 3B1.1(c), and the panel could not say whether the district court would impose the same sentence if it kept the correct Sentencing Guidelines range in mind throughout the process.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel observed that the restitution portion of the judgment – which both required immediate restitution in full and set a mandatory, unconditional schedule of payments during the period of incarceration – is internally inconsistent, and inconsistent with the district court's oral announcement that the defendant lacked the ability to make immediate restitution in full. The panel therefore vacated the restitution schedule and remanded so that the district court can strike the lump-sum payment requirement from the judgment.

## COUNSEL

Lisa C. Hay (argued), Federal Public Defender, Portland, Oregon, for Defendant-Appellant.

Donnamarie Maddux (argued), Assistant United States Attorney; Kelly A. Zusman, Appellate Chief; Billy J. Williams, United States Attorney; United States Attorney's Office, Portland, Oregon; for Plaintiff-Appellee.

## ORDER

The opinion filed July 26, 2018, and published at 897 F.3d 1057, is amended by the opinion filed concurrently with this order.

With these amendments, Appellee's petition for rehearing is **DENIED**. No further petitions for rehearing or rehearing en banc may be filed.

## OPINION

GRABER, Circuit Judge:

A jury convicted Defendant Jack Holden of mail and wire fraud, conspiracy to commit mail and wire fraud, and several money laundering offenses.    Defendant appeals his convictions for mail and wire fraud, arguing that the district court misinstructed the jury on the elements of those crimes. Defendant also challenges the two-level "organizer" sentencing enhancement applied by the district court and the district court's restitution schedule.  We reject Defendant's arguments concerning the jury instructions, but we vacate both his custodial sentence and the restitution portion of the judgment and remand for further proceedings.[1]

## FACTUAL AND PROCEDURAL HISTORY

In the fall of 2007, Defendant and his associate, Lloyd Sharp, met with a group of investors from the Portland, Oregon, area to discuss the possibility of investing in a biofuel operation in Ghana.[2]  Defendant and Sharp had known each other for a long time, but they had reconnected and entered into a joint venture agreement only recently.  The joint venture agreement provided that Defendant and Sharp would work together to start refining biofuel in Ghana.

---

[1] In this opinion, we address only the separation-of-powers challenge to the mail and wire fraud instructions, the challenge to the "organizer" sentencing enhancement, and the challenge to the restitution schedule. We address all remaining issues in a memorandum disposition filed July 26, 2018.

[2] Lloyd Sharp presented himself to the investors as "Kevin Thomas."

Sharp's company was supposed to invest in the refining operation. Defendant's company was responsible for getting the refinery up and running. At the time he signed the joint venture agreement, Defendant was already engaged in the biofuel business in Ghana, but he had not done any large-scale refining; his operations were limited to planting the jatropha plant,[3] the seeds of which eventually would be used to create biofuel.

At the meetings with the investors, Defendant suggested that the Ghana biofuel operation was on the verge of going online; all that was needed was a refinery to start producing fuel. Defendant and Sharp sought $350,000 from the investors to initiate operations at the refinery, and they made specific representations (based on the joint venture agreement) about how that $350,000 would be used. The investors eventually decided to put their money into the project in early 2008. Defendant never completed the purchase of the refinery. Much of the money that he and Sharp received from the investors was not spent on the Ghana refinery project but was, instead, used to pay personal expenses or funneled to family members.

In 2008 and 2009, Defendant began to concentrate his efforts on various biofuel projects in Chile. Defendant conveyed to investors—some of whom had already invested in the Ghana project—that the Chile projects would lead to

---

[3] The jatropha plant is "a big bush that can grow into a small tree. . . . [I]nside [its fruit] pods are several black seeds, each one about twice the size of a coffee bean. Crush those seeds, and you get oil." Dan Charles, *How a Biofuel Dream Called Jatropha Came Crashing Down*, NPR.org (Aug. 21, 2012), https://www.npr.org/sections/thesalt/2012/08/22/1593 91553/how-a-biofuel-dream-called-jatropha-came-crashing-down.

quick profits that could then be poured back into the Ghana venture. After receiving money from the investors, Defendant again failed to spend the money as he had promised. Defendant's offices in Chile were shut down in mid-2009.

Defendant continued to seek investments for the Ghana project throughout the next couple of years. He consistently told investors that he just needed a little more money in order to get the operation up and running. But Defendant never purchased the refinery, never launched a full-scale biofuel operation in Ghana, and never earned any profits for his investors.

In September 2013, Defendant and Sharp were indicted on one count of conspiracy to commit mail and wire fraud, six counts of wire fraud, three counts of mail fraud, six counts of money laundering, and one count of conspiracy to commit money laundering. Sharp pleaded guilty. Defendant went to trial and was convicted on all counts for which he was indicted except for one mail fraud count, which was dismissed at the Government's request. He was sentenced to 87 months in prison, ordered to pay more than $1.4 million in restitution, and ordered to forfeit more than $1.4 million. He timely appeals.

## DISCUSSION

### A.  Mail and Wire Fraud Instructions

Defendant challenges the mail and wire fraud jury instructions given by the district court. We review de novo whether a jury instruction correctly stated the elements of a crime. *United States v. Kilbride*, 584 F.3d 1240, 1247 (9th

Cir. 2009). At bottom, though, Defendant's beef is not with the instructions, which accurately reflected our caselaw, but with our circuit's longstanding construction of the mail and wire fraud statutes. Defendant argues that our "interpretations" of those statutes are not interpretations at all, but instead amount to judicially created crimes in violation of separation-of-powers principles. We review de novo such constitutional issues. *United States v. Kuchinski*, 469 F.3d 853, 857 (9th Cir. 2006).

The mail fraud instruction[4] given by the district court reads as follows:

> In order for the Defendant to be found guilty of [mail fraud], the government must prove each of the following elements beyond a reasonable doubt:
>
> **First**, the Defendant knowingly participated in, devised or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent statements, representations, promises, or omissions of material facts, **or** the Defendant knowingly aided and abetted Lloyd Sharp in doing so;
>
> **Second**, the statements, representations, or promises made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable

---

[4] The wire fraud instruction was substantially the same as the mail fraud instruction.

of influencing, a person to part with money or property;

**Third**, the Defendant acted with the intent to defraud; that is, the intent to deceive or to cheat; and

**Fourth**, the Defendant used, or caused to be used, the mails to carry out an essential part of the scheme, **or** the Defendant knowingly aided and abetted Lloyd Sharp in doing so . . . .

Under our longstanding precedent, "anyone who knowingly and intentionally *participates in* the execution of [a] fraudulent scheme comes within the prohibition of the mail and wire fraud statutes regardless of whether the defendant devised the scheme." *United States v. Manion*, 339 F.3d 1153, 1156 (9th Cir. 2003) (per curiam) (emphasis added) (internal quotation marks and brackets omitted). But, as Defendant correctly points out, the mail and wire fraud statutes, by their terms, punish only those who "devise[] or intend[] to devise any scheme or artifice to defraud"; the word "participate" does not appear in the statutes. 18 U.S.C. §§ 1341, 1343. According to Defendant, by reading the mail and wire fraud statutes to prohibit "participation in" schemes to defraud, we have essentially created new crimes, thus violating separation-of-powers principles. *See, e.g.*, *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 490 (2001) (stating that, "under our constitutional system, . . . federal crimes are defined by statute rather than by common law").

Assuming, without deciding, that Defendant's argument is not foreclosed by precedent, we reject the argument on its merits. "[C]riminal laws are for courts . . . to construe," *Abramski v. United States*, 134 S. Ct. 2259, 2274 (2014), and we do not usurp the role of Congress simply by construing a criminal statute broadly. Separation-of-powers principles may inform how we interpret a statute and may even prevent us from reading an unwritten defense into a statute. *See United States v. Lanier*, 520 U.S. 259, 265 n.5, 266 (1997) (discussing how separation-of-powers principles form part of the theoretical underpinning of the "fair warning" requirement, which itself underlies the void-for-vagueness doctrine and the rule of lenity); *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 490 ("[I]t is an open question whether federal courts ever have authority to recognize a necessity defense not provided by statute."). But so long as we are engaged in interpretation—that is, an effort to "giv[e] effect to the will of the Legislature; or, in other words, to the will of the law," *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 866 (1824)—we do not infringe on Congress' exclusive power to make conduct criminal. *See Nw. Airlines, Inc. v. Transp. Workers Union*, 451 U.S. 77, 97 (1981) ("[T]he authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt.").

"Of course, the line separating statutory interpretation and judicial lawmaking is not always clear and sharp." *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1245 (6th Cir. 1991). Here, though, we clearly have *interpreted* the mail and wire fraud statutes to criminalize "participating in" schemes to defraud. In *Nemec v. United States*, 178 F.2d 656, 661 (9th Cir. 1949), we endorsed the Sixth Circuit's view that, "[i]f one's intent is to defraud when he *joins* a dishonest

[mail fraud] scheme, he becomes a part of the scheme, although he may know nothing but his own share in the aggregate wrongdoing," *Blue v. United States*, 138 F.2d 351, 358–60 (6th Cir. 1943) (emphasis added).[5]  That view rests on the idea that "the substance of an offense under [the mail fraud statute] is the prosecution of a fraudulent purpose, toward the execution or fulfillment whereof the mail is used," so that all those who work toward that fraudulent purpose—who actively "participate in" the scheme—should be held liable.  *Schwartzberg v. United States*, 241 F. 348, 352 (2d Cir. 1917).  As one court noted more than a century ago, a "joint scheme to defraud with acts to effectuate it has the features of a conspiracy," *Blanton v. United States*, 213 F. 320, 325 (8th Cir. 1914), and, as in a conspiracy, "[a]ll with criminal intent who join themselves even slightly to the principal scheme are subject to [liability], although they were not parties to the scheme at its inception,"[6] *Blue*, 138 F.2d at 359.  Whatever the merits of that interpretation, it is undoubtedly an *interpretation* of the mail fraud statute:  an attempt to "giv[e] effect to the will of the Legislature." *Osborn*, 22 U.S. (9 Wheat.) at 866.

---

[5] That view was shared by other circuits at the time.  *See Schwartzberg v. United States*, 241 F. 348, 352 (2d Cir. 1917) ("[A]ll who with criminal intent join themselves even slightly to the principal schemer are subject to the [mail fraud] statute, although they may know nothing but their own share in the aggregate wrongdoing."); *Alexander v. United States*, 95 F.2d 873, 880–81 (8th Cir. 1938) (same).

[6] We have often noted the similarities between conspiracies and joint schemes to defraud.  *See, e.g.*, *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992) ("Mail and wire fraud share as a common first element the existence of a scheme to defraud, which, when more than one person is involved, is analogous to a conspiracy.").

In short, our caselaw holding that "participating in" a scheme to defraud is forbidden by the mail and wire fraud statutes does not amount to the creation of a common-law crime in violation of separation-of-powers principles. The district court therefore did not err by instructing the jury that it could find Defendant guilty for "participating in" a scheme to defraud.[7] We therefore affirm Defendant's mail and wire fraud convictions.[8]

## B.  "Organizer" Enhancement

Defendant next argues that the district court erred by applying a two-level "organizer" sentencing enhancement under § 3B1.1 of the Sentencing Guidelines. We review de novo the district court's construction of the Sentencing Guidelines, but any factual findings that underlie an enhancement are reviewed for clear error. *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir.) (en banc), *cert. denied*, 138 S. Ct. 229 (2017). We review for abuse of discretion the district court's determination as to "whether the specific constellation of facts at issue meets the governing legal standard" set out in the Guidelines. *Id.* at 1171. "It is not necessary that the district court make specific findings of fact to justify the imposition of the role enhancement. There must, however, be evidence in the record that would support"

---

[7] To the extent that Defendant argues that he was denied due process because he was punished for committing acts that are not prohibited by statute, his argument necessarily fails, because "participating in" a scheme to defraud *is* prohibited by the mail and wire fraud statutes as we have interpreted them.

[8] We address—and reject—Defendant's remaining challenges to his mail and wire fraud convictions in a concurrently filed memorandum disposition.

the imposition of the enhancement. *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012) (citation omitted).

The Guidelines allow for a two-level "organizer" enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving fewer than five "participants," provided that the criminal activity was not "extensive." U.S.S.G. § 3B1.1(c) (2015). "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense . . . is not a participant." *Id.* cmt. n.1. In order to impose the enhancement, there must be a "showing that the defendant had control over other[]" participants or "organiz[ed] other[] [participants] for the purpose of carrying out" the charged crimes. *Whitney*, 673 F.3d at 975 (internal quotation marks omitted). A defendant "organizes" other participants if he has "the necessary influence and ability to coordinate the[ir] behavior . . . so as to achieve the desired criminal result[s]." *United States v. Doe*, 778 F.3d 814, 826 (9th Cir. 2015); *see also United States v. Avila*, 95 F.3d 887, 890 (9th Cir. 1996) (stating that "some degree of control or organizational authority over others is required" in order for a § 3B1.1 enhancement to be proper (internal quotation marks omitted)). Mere *facilitation* of criminal activity is not sufficient to support the enhancement. *Doe*, 778 F.3d at 825. Nor is it sufficient for a defendant to have organized property or activities—the defendant must have organized *participants*. *Id.* at 824 n.4.

At the sentencing hearing, the district court found that Defendant and Sharp were "pretty much comparable in their responsibility" and that "they were . . . co-equal." The court

then rejected the Government's argument that Defendant should receive a four-level enhancement under § 3B1.1(a) as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." But the court found that Defendant "was certainly an organizer, he with Sharp," and that he should thus receive a two-level enhancement under § 3B1.1(c) because he and Sharp "organized [the scheme] together."

For the organizer enhancement to be proper, there must be evidence in the record to support the conclusion that Defendant exercised control *over Sharp* or was able to influence *Sharp*, who was the only other "participant."[9] As the district court noted, the record demonstrates that Defendant and Sharp were "co-equal" conspirators—neither was "in charge" of the other. Furthermore, the joint venture agreement between Defendant and Sharp specified that their

---

[9] At oral argument, the Government suggested that the two-level enhancement could be upheld on the theory that Defendant "coordinated the activities of the many . . . non-criminal participants in this case." But only those who "are criminally responsible for the commission of the offense" qualify as "participants"; unwitting facilitators of an offense, even if they are "participants" in the usual sense of the word, do not count. *See United States v. Melvin*, 91 F.3d 1218, 1225–26, 1226 n.5 (9th Cir. 1996) (holding that the defendant's former girlfriend was a "participant" in his scheme to defraud because she "was aware that the scheme was fictitious" and helped to further the scheme); *see also United States v. Brodie*, 524 F.3d 259, 271 (D.C. Cir. 2008) ("A person is 'criminally responsible' under § 3B1.1 only if he commits all of the elements of a statutory crime *with the requisite mens rea*." (internal quotation marks and brackets omitted)). To the extent that the Government is now arguing that the enhancement is proper because Defendant "organized" some *culpable* "participants" besides Sharp, that argument is both unsupported by the record and inconsistent with the Government's position in the district court that "there w[ere] two . . . knowing participants" in Defendant's scheme.

respective companies would split the profits from the Ghana refinery project evenly.  Given those facts, the Sentencing Guidelines suggest that the "organizer" enhancement does not apply.  *See* U.S.S.G. § 3B1.1 cmt. background ("Th[e] adjustment [of § 3B1.1] is included primarily because of concerns about relative responsibility. . . .  [I]t is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it . . . ."); *see also United States v. Egge*, 223 F.3d 1128, 1133 (9th Cir. 2000) ("Section 3B1.1 attempts to apportion *relative* responsibility where an offense involves multiple participants . . . ." (emphasis added)).

The Government argues that the two-level enhancement is proper nonetheless because Defendant gave Sharp "instructions for sending investors' funds to accounts [Defendant] controlled in Ghana."  We think that act is best characterized as "facilitation" rather than "organization." *Compare Whitney*, 673 F.3d at 969, 975–76 (holding that an organizer enhancement was not warranted where the defendant merely "supplied [a co-conspirator] with tax forms and information on filing false returns"), *with Doe*, 778 F.3d at 826 (upholding an organizer enhancement where the defendant "put the [drug] deal[s] together by negotiating the type, quantity, and price of drugs for each transaction, and then ensured the drugs, money, and participants arrived when and where needed").  Defendant did not exercise control or "organizational authority" over Sharp by telling him how to go about depositing money in an account any more than if he had given Sharp directions to his house.  Indeed, if Defendant "organized" Sharp by telling him how to go about making deposits, then it would follow that nearly every co-conspirator in a limited conspiracy of equals would be an "organizer" of his or her comrades, and the enhancement of

§ 3B1.1(c) would be all but automatic for *all* conspirators in such cases. Such a result is inconsistent with the main purpose of the "organizer" enhancement, which is to "apportion *relative* responsibility where an offense involves multiple participants." *Egge*, 223 F.3d at 1133 (emphasis added).

The record does not support the conclusion that Defendant exercised sufficient control or organizational authority over Sharp to qualify for the two-level enhancement of § 3B1.1.(c).[10] Because "we cannot say whether the district court would impose the same sentence if it kept the correct Guidelines range in mind throughout the process," we vacate Defendant's 87-month prison sentence and remand for resentencing. *United States v. Flores*, 725 F.3d 1028, 1042 (9th Cir. 2013).

## C. Restitution

The district court ordered Defendant to pay more than $1.4 million in restitution to the victims of his crimes. The written judgment specifies that the entire amount of restitution is "due immediately" in a "[l]ump sum payment," but it also sets out a schedule of small payments that Defendant must make during his period of incarceration. During the sentencing hearing, the court found that Defendant lacked the ability to make full restitution immediately and that, "[n]o matter how long [Defendant] spends . . . in prison, . . . the victims will not be made whole." Defendant argues that the district court erred by ordering immediate restitution

---

[10] We need not decide whether the district court misinterpreted § 3B1.1(c) or, alternatively, interpreted § 3B1.1(c) correctly but misapplied it to the facts in the record. Either way, the court erred.

in full in light of its finding that he lacked the funds to make such restitution.   We review for abuse of discretion a restitution schedule. *United States v. Inouye*, 821 F.3d 1152, 1156 (9th Cir. 2016) (per curiam).   A district court necessarily abuses its discretion in setting a restitution schedule if it makes a legal error. *Id.*; *see also United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1162 (9th Cir. 2010) ("We review de novo the legality of a restitution order . . . ." (internal quotation marks omitted)).

When a district court orders a defendant to pay restitution under 18 U.S.C. § 3664, it must "specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of . . . the financial resources and other assets of the defendant." *Id.* § 3664(f)(2)(A).  In order to meet its obligation under § 3664, a court must "consider" a defendant's financial resources. *Ward v. Chavez*, 678 F.3d 1042, 1049–50 (9th Cir. 2012).  If the court determines that the defendant is unable to make immediate restitution, the court "must set a repayment schedule in the judgment of conviction." *Id.* at 1050.

At first blush, the restitution portion of the judgment appears internally inconsistent:  it orders Defendant to pay *full* restitution immediately *and* orders him to make payments while incarcerated.  According to the Government, though, the order is not internally inconsistent, because the payment schedule portion of the order is conditional—it kicks in only if Defendant cannot make full immediate restitution.  By ordering full immediate restitution even in the face of evidence that such restitution is impossible, argues the Government, the district court helps to ensure that the Government can seek restitution up to the full amount if

Defendant's financial circumstances should change in the future.

We cannot construe the written restitution schedule in the manner urged by the Government. First, the schedule of payments during incarceration is not phrased in conditional terms—the order simply directs Defendant to pay a certain amount of restitution while incarcerated. Second, the district court found that Defendant lacked the ability to make immediate restitution in full, so it already had found the supposed "condition" that would trigger the payment schedule to be satisfied. Finally, we doubt that an order setting a "conditional" payment schedule during the period of incarceration would be consistent with the statutory scheme. The relevant statutory provisions can be read to suggest that requiring a single lump-sum payment of immediate restitution in full and setting a payment schedule are mutually exclusive orders. *See United States v. Martinez*, 812 F.3d 1200, 1205 (10th Cir. 2015) ("[Section 3572(d)(1)] implies that full payment is due immediately *only if* the district court does not provide for installment payments."); 18 U.S.C. § 3664(f)(3)(A) ("A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments."). For those reasons, we read the district court's judgment as both requiring immediate restitution in full *and* setting a mandatory, unconditional schedule of payments during the period of incarceration.

So construed, the restitution schedule is internally inconsistent. But that inconsistency does not require us to seek clarification from the district court. Again, the district court orally announced that Defendant lacked the ability to

make immediate restitution in full. The written restitution schedule, insofar as it purports to order immediate restitution, is inconsistent with that finding. In this situation, we construe the written judgment to conform to the court's oral ruling. *United States v. Jones*, 696 F.3d 932, 938 (9th Cir. 2012). We therefore vacate the restitution schedule and remand so that the district court can strike the lump-sum payment requirement from the judgment. *Id.*

The Government's concern with this result appears to be two-fold. First, the Government argues that the lump-sum requirement is necessary "to have an enforceable judgment for the full amount of the debt owed." That concern is not well taken because the total amount of restitution ordered by the court is set out in a different portion of the judgment, not in the payment schedule. The judgment contains a required "Amount of Restitution Ordered" of $1,410,760.00; the judgment also provides that Defendant "shall pay the following *total* criminal monetary penalties," including restitution in the amount of $1,410,760.00. (Emphasis added.) That total amount and that portion of the judgment are not at issue; only the details of the payment schedule are.

Second, the Government asserts that a schedule that does not require immediate restitution in full prevents the Government or a victim from recouping unexpected windfalls the defendant receives, such as a bequest. But the judgment separately provides "that resources received from any source, including inheritance, settlement, or any other judgment, shall be applied to any restitution or fine still owed, pursuant to 18 [U.S.C.] § 3664(n)." Moreover, 18 U.S.C. §§ 3572(d)(3) and 3664(k) provide mechanisms by which the Government or a victim may seek to modify a restitution schedule if a

defendant acquires assets that change the defendant's financial circumstances.

Defendant's convictions and the forfeiture order **AFFIRMED**; Defendant's custodial sentence and the restitution schedule **VACATED**; case **REMANDED** for further proceedings.