**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

KAREN GAGARIN,
*Defendant-Appellant.*

No. 18-10026

D.C. No.
3:14-cr-00627-SI-4

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted September 9, 2019
San Francisco, California

Filed February 13, 2020

Before: Ronald M. Gould, Carlos T. Bea, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge Friedland

# SUMMARY[*]

## Criminal Law

The panel affirmed a conviction for aggravated identity theft under 18 U.S.C. § 1028A(a)(1), a three-level sentence enhancement, and the restitution order in a case in which the defendant and her co-conspirators participated in a scheme to defraud a life insurance company by submitting fraudulent insurance applications on behalf of individuals who, in general, did not intend to apply for life insurance or know that their identifying information was being used.

The panel rejected the defendant's challenges to the district court's denial of her motion for judgment of acquittal on the aggravated identity theft count.

The panel held that the defendant "used" a means of identification under the meaning of § 1028A(a)(1), where her forgery of her cousin's signature on a fraudulent application was central to the fraud and "furthered and facilitated" its commission.

The panel rejected the defendant's contention that in order to show that she acted "without lawful authority" as required by the statute, the Government must show that her use of the means of identification was "itself illegal." The panel explained that the defendant's use of her cousin's identity during and in relation to the wire fraud was sufficient.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel wrote that the Seventh Circuit's interpretation of "another person" in *United States v. Spears*, 729 F.3d 753 (7th Cir. 2013) (en banc), to mean "a person who did not consent to the use of the means of identification" contradicts this court's holding in *United States v. Osuna-Alvarez*, 788 F.3d 1183, 1185-86 (9th Cir. 2015) (per curiam). The panel thus held that even if the defendant had her cousin's consent to file an insurance application for her, the panel would follow this circuit's precedent to hold that the defendant used the means of identification of "another person" by using the identification of another "actual person."

The panel held that the district court did not abuse its discretion and commit significant procedural error by imposing a three-level "manager or supervisor" enhancement under U.S.S.G. § 3B1.1(b).

Upholding the restitution order, the panel wrote that there is no indication that the district court employed an erroneous valuation methodology that focused on a criterion other than the actual losses of the victim, and held that the district court did not abuse its discretion by declining to deduct the purported value of "back-end" accounts from the restitution award. The panel declined to second-guess the district court's imposition of joint and several liability, and rejected as unavailing the defendant's contention that the restitution schedule is internally inconsistent.

Concurring except as to the penultimate paragraph of Part II.C, Judge Friedland wrote that she is disinclined to criticize the analysis of the unanimous en banc Seventh Circuit decision in *Spears* "on its own terms," as the majority does.

**COUNSEL**

Carmen A. Smarandoiu (argued), Chief, Appellate Unit; Candis Mitchell, Assistant Federal Public Defender; Steven G. Kalar, Federal Public Defender; Office of the Federal Public Defender, San Francisco, California; for Defendant-Appellant.

Kirstin M. Ault (argued), Assistant United States Attorney; Merry Jean Chan, Chief, Appellate Section, Criminal Division; David L. Anderson, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee.

**OPINION**

GOULD, Circuit Judge:

Defendant Karen Gagarin was convicted of conspiracy to commit wire fraud, wire fraud, and aggravated identity theft. The district court sentenced her to a total of 36 months in prison, after concluding that a three-level "manager or supervisor" sentencing enhancement applied to Gagarin's role in the scheme to defraud the American Income Life Insurance Company (AIL). It also imposed a restitution order, which held Gagarin jointly and severally liable with her convicted co-conspirators for the full loss suffered by AIL. On appeal, Gagarin challenges the district court's denial of her post-trial motion for a judgment of acquittal on the aggravated identity theft count, its imposition of the three-level sentencing enhancement, and the restitution order. We affirm.

## I.

In late 2011, Benham Halali devised a scheme to defraud AIL of millions of dollars.  Halali ran the San Jose, Fresno, Roseville, and Concord offices of the Jatoft-Foti Agency (JFA), the exclusive California sales agent of AIL.  Between September 2011 and Spring 2012, Halali and co-conspirators in those offices, all independent contractors of AIL, submitted hundreds of fraudulent insurance applications to AIL on behalf of individuals who, in general, did not intend to apply for life insurance or know that their identifying information was being used.  Karen Gagarin was a General Agent with sales and managerial responsibility in JFA's San Jose office, and she ran the office when Halali was away.  It is undisputed that she knowingly participated in the fraudulent scheme.

The conspiracy took advantage of AIL's system of compensating agents for insurance policy sales.  For each policy an agent purportedly sold, the agent received advanced commissions and bonuses from AIL according to a specified percentage of the premiums that the policy would be expected to generate during the year.  The conspirators then paid about four months of premiums on the fraudulent policies, from hundreds of different bank accounts opened for that purpose, before defaulting.  According to AIL's compensation structure, policies that lapsed before the end of four months resulted in the agents being "charged back" for their unearned advances, but policies that lapsed after four months would result in only a debit of the unearned value against the agents' "back-end" accounts.  These back-end accounts served as a retirement account of sorts, representing the net earnings an agent could anticipate collecting after leaving the agency, subject to certain conditions.  By keeping the fraudulent policies active for

four months, conspiring agents were able to pocket the difference between their advanced compensation and the premiums they paid on the policies. During the course of this conspiracy, the conspirators submitted about 700 fraudulent applications, although not all applications resulted in issued policies.

To convince AIL of the legitimacy of the fraudulent policies, the conspirators forged electronic signatures on the insurance applications and gave other identifying information of the purported applicants. The conspirators also misrepresented information about the applicants on the insurance applications to increase the likelihood that AIL would grant a policy. When AIL made phone calls to verify the applicant's identity, the conspirators, including Gagarin, would impersonate the purported applicant from dozens of cell phones purchased for that purpose. When AIL requested a medical examination to determine eligibility for insurance, the conspirators engaged in a variety of tactics to accomplish the medical examination, including creating fake drivers' licenses to impersonate applicants during the medical examinations. Halali also encouraged agents to sign up friends and family members for fraudulent policies by offering them the opportunity to get a free medical exam.

When Gagarin was not managing JFA's San Jose office in Halali's absence, her day-to-day responsibilities included selling policies for AIL and supervising certain agents within the office. On several occasions, Gagarin submitted insurance applications that falsely listed these agents as the "writing agent"—the agent who had executed the policy. Because the policy would then be registered officially in those agents' names, Gagarin would ask them to reimburse her for the advanced commissions and bonuses they were paid on those policies.

In September 2011, AIL received an electronic insurance application from Melissa Gilroy, Gagarin's cousin. Although not listed as the writing agent, by all accounts Gagarin was the agent who executed and submitted the application. The application contained false information about Gilroy's employment status, salary, and the nature of her relationship with the intended beneficiary. Although the application contained Gilroy's electronic signature indicating that she was the payor of the policy, the bank account connected to the policy actually belonged to Steven Nguyen—the brother of an admitted co-conspirator in the scheme—and was later replaced by a bank account held in Gagarin's name. Elsewhere, the application contained Gilroy's electronic signature, purportedly certifying that all information in the application was true and correct to the best of her knowledge. The requested policy coverage was for more than $300,000, at a monthly premium of $236.

Pursuant to a grant of immunity, Gilroy testified at trial that she had asked her cousin Gagarin to "sign [her] up for a policy" after experiencing a health scare. Gilroy further testified that she had asked Gagarin to state falsely that Metro PCS was her place of employment because she worried she would be denied insurance if AIL knew she was unemployed. At the same time, Gilroy testified that she had intended to pay for the policy herself and never asked Gagarin to pay for it through anyone else's bank account. Nor had she asked Gagarin to lie about the nature of her relationship to the named beneficiary. Gilroy also stated that she never discussed the type of coverage, the coverage amount, or the premium amount with Gagarin. Although she had previously worked for AIL for a few months, she stated that she was not familiar with AIL's new electronic application process and that she had never seen the

application in question, let alone typed or otherwise electronically signed her name on it.

In December 2014, a grand jury indicted five people—Benham Halali, Ernesto Magat, Kraig Jilge, Karen Gagarin, and Alomkone Soundara—on charges of conspiracy to commit wire fraud under 18 U.S.C. § 1349; wire fraud under 18 U.S.C. § 1343; and aggravated identity theft under 18 U.S.C. § 1028A. Jilge and Soundara pleaded guilty pursuant to a cooperation agreement, while Halali, Magat, and Gagarin went to trial. At trial, the jury found Halali, Magat, and Gagarin guilty of all charges. Gagarin was found guilty of fourteen counts of wire fraud, including Count 10 in connection with the Gilroy insurance application. The Gilroy application also was the basis for Gagarin's Count 24 conviction for aggravated identity theft.

Gagarin filed a post-trial motion for a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, contending that insufficient evidence supported her wire fraud conviction under Count 10 and her aggravated identity theft conviction under Count 24. The district court denied the motion on both counts.

At sentencing, the district court concluded that a three-level sentencing enhancement for having a "manager or supervisor" role applied to Gagarin on the underlying fraud counts, pursuant to § 3B1.1(b) of the United States Sentencing Guidelines. Finding, nonetheless, that Gagarin was "far less culpable than the other two," the court sentenced her to only 12 months of incarceration for the conspiracy and fraud counts. In addition, the court sentenced Gagarin to the mandatory minimum 24 months for the aggravated identity theft conviction, to run consecutively with the 12-month sentence, for a total of 36 months in prison.

The district court also held Gagarin jointly and severally liable with Halali and Magat for restitution to AIL for its losses, which the court assessed at $2,837,791.93, representing the total amount of advances AIL had paid out to the conspirators, less the money AIL had already recovered.

In this timely appeal, Gagarin challenges the district court's denial of her post-trial motion for acquittal on the aggravated identity theft count, the court's imposition of the three-level sentencing enhancement on the fraud claims, and the court's order of restitution. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

We review *de novo* a district court's denial of a Rule 29 motion for a judgment of acquittal. *United States v. Grovo*, 826 F.3d 1207, 1213 (9th Cir. 2016). Upon a defendant's motion, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In determining whether evidence was insufficient to sustain a conviction, we consider whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Here, we consider whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of aggravated identity theft beyond a reasonable doubt. In relevant part, "[w]hoever, during and in relation to any felony violation enumerated in subsection (c)," including wire fraud,

"knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person" is guilty of aggravated identity theft. 18 U.S.C. § 1028A(a)(1). Gagarin claims that three essential elements were not satisfied, contending that (1) she did not "use" a means of identification "during and in relation to" the commission of wire fraud under the terms of the statute, (2) she did not act "without lawful authority," and (3) she did not use the means of identification of "another person." We review questions of statutory interpretation *de novo*. *United States v. Osuna-Alvarez*, 788 F.3d 1183, 1185 (9th Cir. 2015) (per curiam). The parties dispute, as a threshold matter, whether a rational trier of fact could have concluded that, contrary to Gilroy's testimony, Gilroy never requested Gagarin's help applying for insurance. We do not resolve this dispute because, assuming *arguendo* that any rational trier of fact would have determined that Gilroy did make such a request, we conclude nonetheless that sufficient evidence supports each element of the offense.

## A

After oral arguments in this appeal, another panel of our court addressed the meaning of "use" under the aggravated identity theft statute. *See United States v. Hong*, 938 F.3d 1040, 1049–51 (9th Cir. 2019). Drawing on previous treatment of this term in the context of § 1028A by the First and Sixth Circuits, we held in *Hong* that the owner of several massage and acupuncture clinics did not "use" a means of identification when, in order to fraudulently qualify for Medicare reimbursement, he merely misrepresented the nature of treatment that actual patients of his received. *Id.* at 1051. We reasoned that "[n]either Hong nor the physical therapists [complicit in his scheme] 'attempt[ed] to pass themselves off as patients.'" *Id.* (quoting *United States v.*

*Berroa*, 856 F.3d 141, 156 (1st Cir. 2017)).  Nor did they "'purport[] to take some other action on another person's behalf' through impersonation or forgery."  *Id.* at 1051 n.8 (quoting *United States v. Valdez-Ayala*, 900 F.3d 20, 35 (1st Cir. 2018)).  As a result, the defendant did not "use" a means of identification "during and in relation to" his commission of health insurance fraud.  *Id.* at 1051.  In reaching this holding, *Hong* relied on a line of cases from the Sixth Circuit which that court has summarized as establishing that "[t]he salient point is whether the defendant used the means of identification to further or facilitate" the predicate felony for the aggravated identity theft charge.  *United States v. Michael*, 882 F.3d 624, 627–28 (6th Cir. 2018) (summarizing the circuit's approach).[1]

Here, Gagarin purported to take action on behalf of her cousin Melissa Gilroy, and in so doing used Gilroy's identity to further the fraudulent insurance application.  As Gilroy testified, Gilroy never asked Gagarin to sign an insurance application in her name, nor did the two ever discuss specifics, such as the type or amount of coverage Gilroy wanted or the premium she would be willing to pay.  Instead, they discussed in a general sense Gilroy's desire that Gagarin help her find an insurance policy, and Gilroy never saw, let alone signed, the particular application that was submitted to AIL.  Viewing the facts in the light most favorable to the prosecution, *Nevils*, 598 F.3d at 1163–64, the inescapable inference is that Gagarin forged Gilroy's signature in two places on that application.  The application

---

[1] In *Michael*, the Sixth Circuit held that the defendant "used" a means of identification when he "fashion[ed] a fraudulent submission out of whole cloth."  882 F.3d at 629.  It noted that, if he had merely "inflated the amount of drugs he dispensed, the means of identification . . . would not have facilitated the fraud."  *Id.*

contained falsehoods and constituted the basis of Gagarin's Count 10 wire fraud conviction, which is unchallenged on appeal. At the same time, Gagarin's forgery of Gilroy's signature falsely conveyed the impression that Gilroy herself certified that "the answers set forth above are full, complete and true to the best of my knowledge and belief."

Unlike *Hong*, in which the defendant submitted documents about his own eligibility for certain benefits, 938 F.3d at 1049–51, Gagarin "attempt[ed] to pass [herself] off" as her cousin through forgery and impersonation. *Id.* at 1051; *see also United States v. Blixt*, 548 F.3d 882, 886 (9th Cir. 2008) (holding "that forging another's signature constitutes the use of that person's name and thus qualifies as a 'means of identification' under 18 U.S.C. § 1028A"). As our sister circuits have recognized, "the use of another person's means of identification makes a fraudulent claim for payment much harder to detect," *United States v. Medlock*, 792 F.3d 700, 707 (6th Cir. 2015) (quoting *United States v. Abdelshafi*, 592 F.3d 602, 610 (4th Cir. 2010)), and Gagarin's forgery of her cousin's signature did just that by obscuring her own role in the fraudulent application. Her use of Gilroy's means of identification was thus central to the fraud and "furthered and facilitated" its commission. For these reasons, we hold that Gagarin's actions constituted "use" under the meaning of the aggravated identity theft statute.

**B**

Gagarin also contends that she did not act "without lawful authority," a required element of aggravated identity theft. We disagree. We have held that "despite its title, § 1028A does not require theft as an element of the offense." *Osuna-Alvarez*, 788 F.3d at 1185. We have further held that § 1028A's prohibition of the use of another person's means

of identification "without lawful authority" "clearly and unambiguously encompasses situations . . . where an individual grants the defendant permission to possess his or her means of identification, but the defendant then proceeds to use the identification unlawfully." *Id.*

Gagarin acknowledges that, in light of *Osuna-Alvarez*, even if Gilroy consented to the submission of the insurance application, this would not mean that Gagarin had "lawful authority." Gagarin argues that, in order to show that she acted "without lawful authority," the Government must show that her use of the means of identification was "itself illegal."

We disagree. Whether a particular use was "itself illegal" relates to the degree of connection between the use of the identity and the predicate felony. But the statute already contains language about the required nexus: the use must be "during and in relation to" specified unlawful activity. Here, for the reasons stated above, Gagarin used Gilroy's identity during and in relation to the wire fraud that Gagarin does not challenge occurred here. Gagarin has not shown that use "without lawful authority" required more in this case.

## C

Next, Gagarin invites us to adopt the Seventh Circuit's interpretation of "another person." The Seventh Circuit has construed the phrase "another person" in the aggravated identity theft context to mean "a person who did not consent to the use of the 'means of identification.'" *United States v. Spears*, 729 F.3d 753, 758 (7th Cir. 2013) (en banc). The Seventh Circuit found ambiguous the question of whether "another person" refers to a "person other than the defendant" or a "person who did not consent to the

information's use" and therefore resorted to several tools of statutory interpretation to resolve the perceived ambiguity. *Id.* at 756–58. It was concerned that a broad construction of the phrase "would convert most identity fraud into identity theft and add a mandatory, consecutive, two-year term to every conviction," even as it acknowledged that § 1028A's abbreviated list of predicate offenses "is one reason why § 1028A carries a harsher sentence" than the identity fraud statute. *Id.* at 757. The Seventh Circuit further cited to the statutory caption—Aggravated Identity *Theft*—and the Rule of Lenity to support its conclusion that "another person" applies only to a person who did not consent to the information's use. *Id.* at 756–58.

Gagarin argues that because Gilroy requested that Gagarin file an insurance application for her, under *Spears* the "another person" element of aggravated identity theft is not satisfied here.[2] But following *Spears* to so hold would conflict with our precedent in *Osuna-Alvarez.* Interpreting "another person" to mean "a person who did not consent to the use of the means of identification" contradicts our holding that, "regardless of whether the means of identification was stolen or obtained with the knowledge and

---

[2] In *United States v. Maciel-Alcala*, we considered another aspect of the term "another person"—specifically, whether "another person" "encompass[es] both living and deceased persons." 612 F.3d 1092, 1100–01 (9th Cir. 2010). We concluded that it applies to either "so long as the person is an actual person." *Id.* at 1101 (citing *Flores-Figueroa v. United States*, 556 U.S. 646, 654 (2009), which referred to "another person" as a "real person" in determining the scope of § 1028A's "knowledge" requirement); *see also United States v. Doe*, 842 F.3d 1117, 1119–20 (9th Cir. 2016) ("To prove a violation of § 1028A, the Government must prove . . . [t]he defendant knew the means of identification belonged to a real person . . . ."). Gagarin does not dispute that Gilroy is covered by this aspect of what it means to be "another person."

consent of its owner, the illegal use of the means of identification alone violates § 1028A." *Osuna-Alvarez*, 788 F.3d at 1185–86. Under the Seventh Circuit's construction, that case would have been wrongly decided, because it affirmed the defendant's conviction despite the fact that the defendant had permission to use his brother's passport. *See id.*[3]

Nor are we convinced by the interpretive analysis of *Spears* on its own terms. The phrase "another person" does not appear particularly ambiguous on its face, especially when we have already determined the phrase refers to another "actual person." *Maciel-Alcala*, 612 F.3d at 1101. The plain reading of "another person" seems to us to be an actual "person other than the defendant." *Contra Spears*, 729 F.3d at 756 (rejecting this reading). Since "[a] statute's caption . . . cannot undo or limit its text's plain meaning," *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 242 (2004), § 1028A's caption of "Aggravated Identity Theft" does not alter the plain meaning of "another person." Recourse to the Rule of Lenity is not necessary because "another person" is unambiguous.

In summary, even if Gagarin had Gilroy's consent, we follow our circuit precedent to hold that Gagarin used the

---

[3] In *Osuna-Alvarez*, we cited the panel opinion in *Spears*, which was vacated by the Seventh Circuit's en banc decision, as consistent with our holding regarding "without lawful authority." *See* 788 F.3d at 1185. We did not, however, indicate that the *Spears* en banc opinion was consistent with our holding. Today we recognize that it would not be workable to adopt both the *Spears* en banc interpretation of "another person" and the *Osuna-Alvarez* interpretation of "without lawful authority." That the cases interpreted different words in the statute cannot obscure that *Spears* made available a consent defense that *Osuna-Alvarez* squarely rejected.

means of identification of "another person" by using the identification of another "actual person."

## III

Gagarin challenges the district court's application of a three-level "manager or supervisor" role sentencing enhancement, pursuant to § 3B1.1(b) of the United States Sentencing Guidelines.  "A mistake in calculating the recommended Guidelines sentencing range is a significant procedural error that requires us to remand for resentencing." *United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011).  "[A]s a general rule, a district court's application of the Sentencing Guidelines to the facts of a given case should be reviewed for abuse of discretion." *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 229 (2017). Although "[i]t is not necessary that the district court make specific findings of fact to justify the imposition of the role enhancement," there must be evidence in the record to support the enhancement.  *United States v. Holden*, 908 F.3d 395, 401 (9th Cir. 2018) (quoting *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012)), *cert. denied*, 139 S. Ct. 1645 (2019).

To qualify for a three-level sentencing enhancement under § 3B1.1(b), a defendant must have managed or supervised one or more other "participants" in an extensive criminal activity.[4]  *United States v. Gadson*, 763 F.3d 1189, 1222 (9th Cir. 2014).  A participant is a person "who [is] criminally responsible for the commission of the offense, but

---

[4] Gagarin does not dispute that the conspiracy to defraud AIL involved five or more participants or was otherwise extensive, as required for § 3B1.1 to apply.

[who] need not have been convicted." *Id.* (internal quotation marks and citation omitted). In determining by a preponderance of the evidence whether the enhancement applies, the district court considers factors such as:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4; *Gadson*, 763 F.3d at 1222. In particular, "there must be evidence that the defendant exercised some control over others involved in commission of the offense [or was] responsible for organizing others for the purpose of carrying out the crime." *Gadson*, 763 F.3d at 1222 (quoting *United States v. Riley*, 335 F.3d 919, 929 (9th Cir. 2003)). The role enhancement cannot apply if the defendant and the other participant are merely "co-equal conspirators." *Holden*, 908 F.3d at 402.

The district court did not abuse its discretion because "evidence in the record supports an inference that [Gagarin] exercised the requisite degree of control" over at least one criminally responsible participant, Reza Zabihi. *Gadson*, 763 F.3d at 1222. There is no dispute that Zabihi, who joined the San Jose office of JFA as an intern a few months before the initiation of the conspiracy, was a criminally responsible participant in the fraudulent scheme. At the time of the offenses, Zabihi served as a sales agent of AIL policies and as an unofficial personal assistant to Halali, even as Zabihi

held the "joke" title of HR manager. On many occasions, Zabihi complied with Halali's instructions to "Go get me two free accounts," which Zabihi knew meant unused bank accounts that could be used to pay fraudulent policies.

Although Zabihi principally answered to Halali, Gagarin ran the San Jose office when Halali was absent and was thus in charge of Zabihi during those times. That both Gagarin and Zabihi took instructions from Halali does not mean that they were "co-equal conspirators." *See* U.S.S.G. § 3B1.1 cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."); *see also Holden*, 908 F.3d at 402–03 (overturning the imposition of a sentencing enhancement where the district court expressly determined that the only two conspirators were "co-equal" but nonetheless impermissibly imposed a role enhancement). In addition to running the office in Halali's place, Gagarin also guided Zabihi through actions to further the conspiracy. On at least one occasion, she instructed Zabihi to "give [her] two bank accounts" for use in paying premiums on fraudulent policies. Zabihi also testified that he gave Gagarin Google Voice phone numbers for her to use on applications as the numbers for fake insurance applications. Cross-examination of Zabihi, which showed that he had neglected to inform investigators of Gagarin's role in the conspiracy on multiple occasions, also may have created a reasonable inference that Zabihi's testimony was less than forthcoming about the extent of Gagarin's involvement. On these bases, enough evidence in the record existed for the district court to infer, by a preponderance of the evidence, that Gagarin exercised control over Zabihi, a criminally responsible participant in the conspiracy. *Gadson*, 763 F.3d at 1222. We hold that the district court did not abuse its discretion and commit

significant procedural error by imposing a three-level "manager or supervisor" enhancement.

## IV

The legality of a restitution order is reviewed *de novo*, *United States v. Galan*, 804 F.3d 1287, 1289 (9th Cir. 2015), as is the district court's "valuation methodology," *United States v. Berger*, 473 F.3d 1080, 1104 (9th Cir. 2007). If "the order is within statutory bounds," then the restitution calculation is reviewed for abuse of discretion, with any underlying factual findings reviewed for clear error. *Galan*, 804 F.3d at 1289. We also review a district court's decision to impose joint and several liability for abuse of discretion. *United States v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002).

## A

Under the Mandatory Victims Restitution Act (MVRA), which applies "in all sentencing proceedings for convictions of . . . an offense against property under this title . . . including any offense committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), a court must order restitution to each victim in the full amount of the victim's losses, 18 U.S.C. § 3664(f)(1)(A). Because "[t]he purpose of restitution is to put the *victim* back in the position he or she would have been but for the defendant's criminal conduct," *United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010), the "amount of restitution is limited to the victim's 'actual losses' that are a direct and proximate result of the defendant's offense," *United States v. Thomsen*, 830 F.3d 1049, 1065 (9th Cir. 2016) (quoting *United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015)). Actual loss represents the difference between "(1) the loss [the victim] incurred because of the unlawful conduct, [and] (2) the loss the [victim] would have incurred had [defendant] acted

lawfully." *United States v. Bussell*, 504 F.3d 956, 965 (9th Cir. 2007).

A district court is to resolve disputes as to the proper amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e). Although the Government bears the initial burden of proving the loss amount, "[t]he question of who bears the burden for establishing a right to statutory offset is . . . left to the court's determination of what 'justice requires.'" *United States v. Crawford*, 169 F.3d 590, 593 n.2 (9th Cir. 1999); *see* 18 U.S.C. § 3664(e) (for matters other than proving the loss amount or the defendant's financial resources, the burden "shall be upon the party designated by the court as justice requires"). For that reason, we have upheld a restitution order where "it appears that the district court placed this burden on the defendant." *Crawford*, 169 F.3d at 593 n.2; *accord United States v. Serawop*, 505 F.3d 1112, 1127 (10th Cir. 2007).

Gagarin asserts that the district court employed an unlawful valuation methodology or at least abused its discretion by choosing not to deduct the value of Defendants' "back-end" accounts from the restitution award. As described earlier, these accounts contained the ongoing earnings from commissions not yet paid through advances, minus the value of any advances that exceeded the agents' actual earnings, e.g., because the policyholder stopped paying premiums before the end of the period for which the advance was made. Agents were permitted to collect from these back-end accounts upon leaving the company, so long as they were not fired for cause, their interest had vested, and payments continued to be made on the policies that the agents had sold. Gagarin contends that these back-end accounts were real, vested assets, to which Defendants would have been entitled had they acted lawfully, and

therefore that the value of the accounts should be deducted from the restitution amount in accordance with *Bussell*, 504 F.3d at 965.

There is no indication, however, that the district court employed an erroneous valuation methodology that focused on a criterion other than the actual losses of the victim. Rather, the court chose not to deduct the value of the back-end accounts because of its conclusion that the accounts were only "estimates which do not affect the calculation of the loss here," relying in part on the conclusions of the Presentence Report. Since the district court applied the proper standard, we review its determination of the amount of loss for only clear error. *Galan*, 804 F.3d at 1289.

Because "it appears that the district court placed [the] burden [of establishing the right to a deduction] on the defendant," *Crawford*, 169 F.3d at 593 n.2, Defendants had to prove by a preponderance of the evidence that they would have been entitled to the value of the back-end accounts had they acted lawfully. *See Bussell*, 504 F.3d at 965. Although Defendants' counsel elicited an isolated acknowledgment that an agent could be paid the value of the back-end accounts upon termination *if* "customers continue to pay premiums" and "if the agent was vested," the weight of the evidence characterized the back-end accounts not as actual, vested entitlements, but rather as projections of the present value of future commissions, "if all necessary criteria were met." Defendants did not show that all necessary criteria were met. For example, it is far from clear that, had Defendants not committed the crimes that caused them to be fired for cause, they would have eventually left AIL in good standing and would have met the necessary criteria to be paid from the back-end accounts. *See Serawop*, 505 F.3d at 1127 (holding that a defendant could not prove entitlement to a

deduction based on speculative assumptions).  The district court did not commit clear error by finding that Defendants had not met their burden and that the back-end accounts were "estimates which do not affect the calculation of the loss here."  As a result, we hold that the district court did not abuse its discretion by declining to deduct the purported value of the back-end accounts from the restitution award.

**B**

Gagarin's remaining claims lack merit.  The MVRA expressly permits the imposition of joint and several liability, 18 U.S.C. § 3664(h) ("the court may make each defendant liable for payment of the full amount of restitution"), and Gagarin cites no authority that reversed as abuse of discretion a district court's imposition of joint and several liability in this context.  Since the "court knew it had [the] option" to apportion the restitution award among the Defendants, "but decided not to exercise it," we decline to second-guess the court's decision.  *Booth*, 309 F.3d at 576.

Gagarin's contention that the restitution schedule is internally inconsistent is also unavailing.  Gagarin relies on *United States v. Holden*, in which we vacated and remanded a restitution order because the restitution schedule's requirement of both a "[l]ump sum payment" due immediately and a schedule of small payments to be made during the defendant's period of incarceration was internally inconsistent. 908 F.3d at 403.  But in *Holden*, the imposition of installment payments during incarceration was not contingent, by the schedule's terms, on non-payment of the lump sum.  The restitution schedule in this case, in contrast, is implicitly conditional: It specifies that a lump sum payment is "due immediately," but that the "balance"—*i.e.*, any portion of that single restitution amount that is not in fact paid "immediately"—is  "due . . . in accordance with" an

installment plan. Gagarin contends that the restitution schedule in *Holden* used the same "balance due" conditional language as the district court used here with respect to the defendant's *post*-incarceration payment schedule. But *Holden* vacated the restitution schedule on account of the "unconditional schedule of payments *during* the period of incarceration." *Id.* at 404 (emphasis added). And unlike in *Holden*, where the district court expressly found that the defendant lacked ability to pay according to the schedule, *id.*, here there has been no such finding. We conclude that there was no error in the district court's restitution order.

## V

For the foregoing reasons, we affirm the aggravated identity theft conviction, the sentencing enhancement, and the restitution order.

**AFFIRMED**.

FRIEDLAND, Circuit Judge, concurring except as to the penultimate paragraph of Part II.C:

I concur in Judge Gould's thoughtful opinion as to all issues but one: I am disinclined to criticize "on its own terms" the analysis of the unanimous en banc Seventh Circuit in *United States v. Spears*, 729 F.3d 753 (7th Cir. 2013).

I agree that *Spears*'s holding is irreconcilable with this court's holding in *United States v. Osuna-Alvarez*, 788 F.3d 1183 (9th Cir. 2015). I also agree that, under a faithful application of our court's precedent, Gagarin's conviction must be affirmed. In my view, however, *Spears* adopts a

reasonable limiting interpretation of a statute that could otherwise be stretched to cover situations far afield from what its title says it is about: aggravated identity *theft*, not mere identity *fraud*.

*Spears* explains that there is a risk, in reading the ambiguous text of 18 U.S.C. § 1028A too broadly, of sweeping in conduct involving a "means of identification" that is hardly *stolen* from a victim; the identity might, under some interpretations of the statute, belong even to a willing participant in the predicate offense. *See Spears*, 729 F.3d at 756 (describing an interpretation of the statute that would cover "every time a tax-return preparer claims an improper deduction"). By holding that the term "another person" describes only "a person who did not consent to the use of the 'means of identification,'" *Spears* provides one way to make sure courts do not "convert most identity *fraud* into identity *theft* and add a mandatory, consecutive, two-year term to every conviction, even though [the identity fraud statute] lacks any equivalent sentencing provision." *See id.* at 757–58 (emphases added). Indeed, although our holding in *Osuna-Alvarez* is irreconcilable with *Spears*'s holding, our later caselaw has, relying on language in § 1028A that was not analyzed in either of those cases, incorporated limitations that flow from the same concerns that animated the Seventh Circuit's decision in *Spears*. *See United States v. Hong*, 938 F.3d 1040, 1051 (9th Cir. 2019) (rejecting a broad interpretation of the term "use" based on the First Circuit's analysis in *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017), which in turn relied on *Spears*).

If this appeal had arisen on a blank slate, I would have given serious consideration to adopting *Spears*'s holding. And for the reasons expressed in *Spears*, I believe there may be a need in future cases to adopt interpretations of the

identity theft statute that help prevent it from being read to impose harsh sentences for offenses that do not actually involve identity theft.  I therefore refrain from criticizing our sister circuit's sensible attempt to interpret this puzzling statute.