**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

SAM SARKIS SOLAKYAN,

*Defendant-Appellant*.

No. 22-50023

D.C. No.
3:18-cr-04163-
BAS-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Cynthia A. Bashant, District Judge, Presiding

Argued and Submitted October 17, 2023
Pasadena, California

Filed September 30, 2024

Before: A. Wallace Tashima, Daniel P. Collins, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sanchez

# SUMMARY[*]

## Criminal Law

The panel (1) affirmed Sam Sarkis Solakyan's conviction for (a) conspiracy to commit honest-services mail fraud and health-care fraud and (b) honest-services mail fraud and aiding and abetting; (2) vacated the district court's restitution order; and (3) remanded for further proceedings, in a case arising from a workers' compensation fraud that generated $263 million in claims.

Solakyan, the owner and operator of multiple medical-imaging companies, routed unsuspecting patients from complicit physicians and medical schedulers to his companies for superfluous magnetic resonance imagery ("MRI") scans and other medical services.

Reviewing for plain error Solakyan's claim that his indictment was legally defective because the honest-services fraud statute does not extend to doctor-patient relationships, the panel held that honest-services mail fraud, as proscribed by 18 U.S.C. §§ 1341 and 1346, encompasses bribery and kickback schemes that deprive patients of their intangible right to the honest services of their physicians.

Reviewing de novo Solakyan's claim that the district court erred in failing to instruct the jury that honest-services fraud requires the government to prove that the patient-victims suffered some kind of tangible harm, the panel held

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that actual or intended tangible harm is not an element of honest-services fraud.

Solakyan contended that the indictment failed to allege the requisite willfulness for health-care fraud as an object of the charged conspiracy. The panel did not resolve a dispute as to the applicable standard of review, concluding that even under de novo review, the indictment, which signaled that Solakyan acted with a bad purpose, sufficiently informed Solakyan of the conspiracy charge predicated on health-care fraud as one of the objects of the conspiracy.

The panel held that the district court did not abuse its discretion in the formulation of its jury instructions regarding the health-care object of the conspiracy. A general mens rea instruction was not misleading or inadequate to guide the jury's deliberations because the jury was separately instructed on each object of the conspiracy, each with its own delineated mens rea requirement. The jury would have understood that it should apply the "willfully" instruction to the health-care fraud object and apply "knowingly" as to the honest-services mail fraud object.

The panel held that the district court did not abuse its discretion by including a "reasonably foreseeable" standard for use of the mails in its conspiracy instruction.

The panel reviewed for plain error Solakyan's claim that the district court's inclusion of an attempt instruction constituted a "constructive amendment" to the charges and created a duplicity error that deprived him of his constitutional right to a unanimous verdict. The panel held that even assuming the district court erred in failing to give a unanimity instruction, Solakyan did not demonstrate that such error affected his substantial rights or seriously affected

the fairness, integrity, or public reputation of the judicial proceedings.

The panel held that the district court did not err in ordering a restitution amount that is distinct from the loss amount calculated for purposes of sentencing. A court's leniency on the loss calculation for sentencing purposes does not hamstring its discretion to impose a larger restitution order in an amount fully borne by a defendant's victims.

The panel held that the district court abused its discretion in failing to make specific findings as to why it did not deduct from the $27,937,175 restitution amount payments the insurers would have made for medically necessary MRIs in the absence of fraud. The panel therefore vacated the restitution order and remanded for the district court to determine whether the total loss amount should be reduced, at least in part, by the cost of reimbursement for medically necessary MRIs the insurers would have incurred had Solakyan acted lawfully.

## COUNSEL

Benjamin L. Coleman (argued), Benjamin L. Coleman Law PC, San Diego, California; Timothy A. Scott and Marcus S. Bourassa, McKenzie Scott PC, San Diego, California; for Defendant-Appellant.

Adam P. Schleifer (argued), Assistant United States Attorney, Major Frauds Section; David R. Friedman, Assistant United States Attorney; Faraz R. Mohammadi, Assistant United States Attorney, Santa Ana Branch Section; Consuelo S. Woodhead, Assistant United States Attorney, Criminal Appeals Section; Bram M. Alden, Assistant United

States Attorney, Chief, Criminal Appeals Section; E. Martin Estrada, United States Attorney; United States Department of Justice, Office of the United States Attorney, Los Angeles, California; for Plaintiff-Appellee.

## OPINION

SANCHEZ, Circuit Judge:

Defendant Sam Sarkis Solakyan ("Solakyan") appeals his jury conviction and restitution order arising from a workers' compensation fraud that generated $263 million in claims—one of the largest workers' compensation bribery schemes ever uncovered in San Diego County. Solakyan, the owner and operator of multiple medical-imaging companies, routed unsuspecting patients from complicit physicians and medical schedulers to his companies for superfluous magnetic resonance imagery ("MRI") scans and other medical services. We address several issues on appeal: (1) whether honest-services mail fraud under 18 U.S.C. §§ 1341 and 1346 may be based on a doctor-patient relationship and requires a showing of tangible harm as an element of the offense; (2) whether the indictment charging Solakyan with conspiracy to commit honest-services fraud and health-care fraud adequately alleged willful misconduct; (3) whether the district court committed reversible error in its jury instructions; and (4) whether the district court erred in ordering Solakyan to pay defrauded insurance companies $27,937,175 in restitution. We have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. We affirm Solakyan's conviction on all counts but vacate and remand the restitution order for further findings consistent with this opinion.

## I.

The California workers' compensation system requires that California employers provide benefits to their employees for qualifying injuries sustained in the course of their employment. Under the state system, all claims for payments for services or benefits provided to an injured employee, including medical and legal fees, are billed directly to and paid by the insurer. If the insurer does not pay, the provider can file a lien against the employee's workers' compensation claim, which accrues interest until paid in an amount ordered by the Workers' Compensation Appeals Board, or an amount negotiated between the insurer and the provider.

California anti-kickback statutes prohibit offering, delivering, soliciting, or receiving anything of value in return for referring a patient for ancillary medical procedures. *See* Cal. Bus. & Prof. Code § 650.01; Cal. Lab. Code § 139.3; Cal. Welf. & Inst. Code § 14107.2. The California Labor Code specifically prohibits "cross-referrals," a referral dependent on another referral occurring. *See* Cal. Lab. Code § 139.3(c). The California Labor Code voids as a matter of law any claim submitted to an insurer that has been secured in violation of the ban on bribes or kickbacks, whether in the form of monetary payment or a cross-referral scheme. *See id.* § 139.3(f).

Solakyan was the senior executive or owner of several companies that operated medical diagnostic-screening facilities throughout California. From 2012 to 2016, Solakyan conspired with medical schedulers Carlos Arguello and Fermin Iglesias, who operated a company called MedEx Solutions ("MedEx"), to locate and direct patients to his companies for medically unnecessary MRIs.

Arguello targeted uninsured, mostly undocumented, and non-English-speaking claimants who were generally unfamiliar with the state workers' compensation and health-care systems. Iglesias steered those patients to co-conspiring physicians, such as Dr. Steven Rigler, who agreed to generate orders for MRIs and other medical services and allowed MedEx to route those orders to providers. These providers included Solakyan's companies, which in turn paid bribes and kickbacks to Dr. Rigler, Iglesias, and Arguello.[1] Unbeknownst to Solakyan, the Federal Bureau of Investigation was conducting an extensive undercover operation to investigate the widespread California workers' compensation kickback scheme.

On September 25, 2018, the Government filed a 12-count indictment charging Solakyan in Count 1 with conspiracy to commit honest-services mail fraud and health-care fraud in violation of 18 U.S.C. §§ 1341, 1346, 1347, and 1349; and in Counts 2 through 12 with honest-services mail fraud and aiding and abetting in violation of 18 U.S.C. §§ 1341, 1346, and 2. The Government alleged that Solakyan provided medically unnecessary MRI scans for unsuspecting and uninsured patients referred to his companies in a bribery and kickback scheme, capitalizing on the lack of oversight within the state workers' compensation system. Solakyan's scheme compensated co-conspiring physicians through cross-referrals and direct payments of cash in hand-delivered envelopes.

After a seven-day jury trial and less than a day of deliberation, the jury found Solakyan guilty on all counts. The district court sentenced Solakyan to 60 months in prison

---

[1] Iglesias, Arguello, and Dr. Rigler were all charged in related prosecutions.

and ordered him to pay $27,937,175 in restitution to the nine largest insurers affected by the kickback scheme. Solakyan filed multiple pre- and post-trial motions challenging the indictment, jury instructions, and restitution proceedings. This appeal followed.

## II.

Congress enacted the mail fraud statute, 18 U.S.C. § 1341, in 1872 "with the purpose of prohibiting use of the mails in furtherance of 'any scheme or artifice to defraud.'" *United States v. Milovanovic*, 678 F.3d 713, 720 (9th Cir. 2012) (en banc) (citing *McNally v. United States*, 483 U.S. 350, 356 (1987)). The "original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *McNally*, 483 U.S. at 356.

"In 1909, Congress amended the statute by adding the words 'or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises' after the original phrase 'any scheme or artifice to defraud.'" *Milovanovic*, 678 F.3d at 720 (quoting *McNally*, 483 U.S. at 357). Following this amendment, the mail fraud statute criminalized schemes or artifices "to defraud" *or* "for obtaining money or property by means of false or fraudulent pretenses, representations or promises," and this disjunctive phrasing gave rise to the judicially created doctrine of honest-services fraud. *See McNally*, 483 U.S. at 358. To give independent meaning to these alternative forms of proscribed conduct, circuit courts in the ensuing decades held that "schemes to defraud" under the mail fraud statute "include[d] those designed to deprive individuals, the people, or the government of intangible rights, such as the

right to have public officials perform their duties honestly." *Id.*

In 1987, the Supreme Court in *McNally v. United States* broke sharply from this circuit precedent. *McNally* "rejected the entire concept of honest-services fraud and held that the mail fraud statute was 'limited in scope to the protection of property rights.'" *Percoco v. United States*, 598 U.S. 319, 327 (2023) (quoting *McNally*, 483 U.S. at 360). The Court in *McNally* reasoned that the phrase "to defraud" commonly involved deprivations of property rights by dishonest methods or schemes, and that Congress had given no indication it had intended to depart from this traditional understanding. 483 U.S. at 358–59. "Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials," the Court construed the mail fraud statute to be "limited in scope to the protection of property rights." *Id.* at 360. "If Congress desires to go further, it must speak more clearly than it has." *Id.*

Congress "responded swiftly" the following year by enacting 18 U.S.C. § 1346, which provides that the phrase "scheme or artifice to defraud"—a phrase appearing in both § 1341 and the wire fraud statute, 18 U.S.C. § 1343— "includes a scheme or artifice to deprive another of the intangible right of honest services." *Percoco*, 598 U.S. at 327 (quoting *Skilling v. United States*, 561 U.S. 358, 402 (2010)). In *Skilling*, the Supreme Court rejected the claim that 18 U.S.C. § 1346 was unconstitutionally vague and held that "§ 1346 covers the 'core' of pre-*McNally* honest-services case law and [does] not apply to '*all* intangible rights of honest services whatever they might be thought to be.'" *Percoco*, 598 U.S. at 328 (quoting *Skilling*, 561 U.S.

at 404–05).   The Court defined the "core" cases as those "involv[ing] fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Skilling*, 561 U.S. at 404. The Supreme Court thus pared back honest-services fraud to "*only* the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 409; *see also United States v. Avery*, 719 F.3d 1080, 1085 (9th Cir. 2013).

Honest-services fraud applies to both private- and public-sector bribes and kickback schemes.   *See Skilling*, 561 U.S. at 413 n.45 (noting "§ 1346[] appli[es] to state and local corruption and to private-sector fraud").   "Neither the words of § 1346 nor its context suggests [a] public-corruption-only limitation." *United States v. Williams*, 441 F.3d 716, 722 (9th Cir. 2006).

## III.

Solakyan challenges his criminal prosecution for honest-services fraud on two grounds.   First, he argues that the scope of the honest-services fraud statute does not extend to physician-patient relationships.   Second, he contends that honest-services fraud requires that the defendant cause or intend to cause some kind of tangible harm to the fraud victim and, therefore, that the district court erred in failing to instruct the jury on this element of the offense.   We address each contention in turn.

## A.

For the first time on appeal, Solakyan claims that his indictment was legally defective because the honest-services fraud statute does not extend to doctor-patient relationships. Solakyan was required to raise this challenge by pretrial motion because the basis for the motion was reasonably

available to him and could have been determined without a trial on the merits. *See* Fed. R. Crim. P. 12(b)(3)(B). The indictment expressly stated that the honest-services fraud counts against Solakyan arose from a breach of physicians' "fiduciary duty to their patients," and the indictment charged him in "a material scheme to defraud and to deprive patients of the intangible right to their physicians' honest services."

Although Solakyan filed multiple pretrial motions to dismiss, none asserted the claim that § 1346 does not apply to doctor-patient relationships. Moreover, Solakyan proposed—and the court adopted—a jury instruction requiring the jury to find that Dr. Rigler owed a "fiduciary duty" to his patients, as defined by our decision in *Milovanovic*. *See* 678 F.3d at 723 n.9. It was only in post-trial briefing that Solakyan raised the argument that Congress did not intend for § 1346 to encompass doctor-patient relationships.

Because Solakyan failed to properly raise below his contention that § 1346 does not apply to doctor-patient relationships, we review that claim for plain error. *See United States v. Guerrero*, 921 F.3d 895, 897 (9th Cir. 2019) ("Plain-error review under Rule 52(b) is the default standard governing our consideration of issues not properly raised in the district court, and the Supreme Court has set a high bar for creating exceptions to that standard."); *see also United States v. Qazi*, 975 F.3d 989, 992 (9th Cir. 2020) ("Pre-trial indictment challenges are reviewed de novo and post-trial challenges are reviewed for plain error.").[2]

---

[2] To establish plain error, Solakyan bears the burden of demonstrating (1) legal error that (2) was "clear or obvious, rather than subject to

In *Milovanovic*, we addressed whether breach of a fiduciary duty was a required element of honest-services mail fraud under §§ 1341 and 1346, and if so, whether the fiduciary relationship must be a formal one or whether honest-services fraud also "reaches those who assume a comparable duty of loyalty, trust, or confidence." 678 F.3d at 721-22. The lead defendants were independent contractors who provided translation services for Washington State government agencies. *Id.* at 718. The defendants allegedly participated in a scheme to defraud the Washington Department of Licensing by accepting bribes in exchange for helping unqualified applicants obtain commercial drivers' licenses by assisting in exam cheating and making false certifications. *Id.* at 716–19. We agreed with the parties that, under *Skilling*, "bribe and kickback" schemes at the core of § 1346 prosecutions require a breach of fiduciary duty as an element of the offense. *Id.* at 722. The parties disputed whether independent contractors could be subject to prosecution under the honest-services mail fraud statute. *Id.*

We held that "a fiduciary duty for the purposes of the Mail Fraud Statute is not limited to a formal 'fiduciary' relationship well-known in the law, but also extends to a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." *Id.* at 724. The defendants' independent contractor status did not

---

reasonable dispute," (3) "affected [his] substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings," and (4) "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (internal quotation marks and citations omitted).

foreclose a legal determination that a relationship of trust existed between the State of Washington and the defendants. *Id.* We observed that the definition of "fiduciary" "is certainly flexible enough to encompass" the conduct described in the indictment because the State "entrusted [defendants] to honestly and truthfully administer the written and skills [driving] tests and to interpret and certify the results." *Id.* We held that "the 'intangible right to honest services' in § 1346, as devised by Congress, encompasses situations such as the conduct alleged here." *Id.* at 726.

We now hold that under *Skilling* and *Milovanovic*, honest-services mail fraud, as proscribed by 18 U.S.C. §§ 1341 and 1346, encompasses bribery and kickback schemes that deprive patients of their intangible right to the honest services of their physicians. As we explained in *Milovanovic*,

> A "fiduciary obligation" exists whenever one person—the client—places special trust and confidence in another person—the fiduciary—in reliance that he will exercise his discretion and expertise with the utmost honesty and forthrightness in the interests of the client, such that the client relaxes the care and vigilance which he would ordinarily exercise, and the fiduciary knowingly accepts that special trust and confidence and thereafter undertakes to act on behalf of the client based on such reliance.

*Id.* at 723 n.9. Sections 1341 and 1346 therefore "reach those who assume a comparable duty of loyalty, trust, and confidence, the material breach of which, with the intent to

defraud, deprives the victim of the intangible right to honest services." *Id.* at 729.

The physician-patient relationship falls squarely within this definition of a fiduciary relationship. Few relationships rely on a greater degree of trust and confidence than the one between a patient and his or her physician. In a typical physician-patient relationship, the physician "is required to act for the benefit of [the patient] on all matters within the scope of their relationship," *see id.* at 722 (quoting *Fiduciary*, Black's Law Dictionary (9th ed. 2009)), using his or her specialized knowledge, expertise, and judgment to guide patients through health-care options, obtain their informed consent, and provide or facilitate treatment. Patients place a special confidence and trust in their doctors to provide medical advice that is solely in the patient's best interest and is free of any undisclosed personal or financial conflicts.[3] Whether a particular doctor-patient relationship gives rise to a fiduciary duty is a "fact-based determination" to be made by a properly instructed jury. *Id.* at 723. Consistent with *Milovanovic*, the jury here was instructed on the fiduciary-duty requirement and found that it was met. Because Solakyan's bribery and kickback scheme falls within "the 'core' of pre-*McNally* honest-services case law," *Percoco*, 598 U.S. at 328, Solakyan has not established any

---

[3] California law also provides that physicians have a fiduciary duty to their patients to disclose all information material to the patient's health, whether medical or economic, that might affect a physician's professional judgment. *See, e.g.*, *Cobbs v. Grant*, 502 P.2d 1, 11 (Cal. 1972) ("[T]he patient's right of self-decision is the measure of the physician's duty to reveal."); *Moore v. Regents of Univ. of California*, 793 P.2d 479, 483 (Cal. 1990) ("[A] physician must disclose personal interests unrelated to the patient's health, whether research or economic, that may affect the physician's professional judgment . . . .").

error, much less plain error, in his prosecution for honest-services mail fraud under §§ 1341 and 1346.

Two of our sister circuits have also recognized honest-services fraud prosecutions arising from physician-patient relationships. In *United States v. Nayak*, the Seventh Circuit concluded that the defendant's "bribe-and-kickback scheme to drum up business for his surgery centers" fell "squarely within the scope of § 1346 as the Court construed it in *Skilling*." 769 F.3d 978, 981 (7th Cir. 2014); *see also id.* at 984 ("Indeed, the intangible harm from a fraud can often be quite substantial, especially in the context of the doctor-patient relationship, where patients depend on their doctor—more or less completely—to provide them with honest medical services in their best interest."). Similarly, in *United States v. Simon*, the First Circuit held that a defendant's scheme to have "health-care practitioners . . . breach their fiduciary duty to their patients by prescribing [a drug] outside the usual course of professional practice and not for a legitimate purpose" properly predicated criminal liability under §§ 1341 and 1346. 12 F.4th 1, 28-29 (1st Cir. 2021) (citation omitted).

Solakyan contends that § 1346 is meant to apply only when the "existence of a fiduciary relationship" is "beyond dispute," *see Skilling*, 483 U.S. at 407 n.41, and he identifies certain federal and state court cases that have declined to recognize a fiduciary duty arising from the doctor-patient relationship. *See In re Gergely*, 110 F.3d 1448, 1450–51 (9th Cir. 1997) (interpreting "fiduciary" in the Bankruptcy Code); *Pegram v. Herdrich*, 530 U.S. 211, 231 (2000) (interpreting "fiduciary" under the Employee Retirement Income Security Act of 1974 ("ERISA")). He contends that Congress did not intend for an expansive or inconsistent

application of § 1346 by sweeping in cases involving physician-patient relationships.

We are not persuaded. *In re Gergely* addressed the meaning of "fiduciary" within a section of the Bankruptcy Code, and we specifically noted that "[t]he broad, general definition of fiduciary—a relationship involving confidence, trust, and good faith—is inapplicable." 110 F.3d at 1450 (citation omitted). *Pegram* similarly dealt with a specialized definition of "fiduciary" within the meaning of ERISA, as "someone acting in the capacity of manager, administrator, or financial advisor to" an employee welfare benefit plan. 530 U.S. at 222. Neither case demonstrates that the district court committed "clear or obvious error" in instructing the jury on the general definition of fiduciary duty articulated in *Milovanovic* to determine if a comparable trusting relationship arose in the physician-patient interactions in this case. *Puckett*, 556 U.S. at 135. Moreover, Solakyan has not identified a single circuit court decision supporting his claim that the honest-services fraud statute does not encompass doctor-patient relationships. *See United States v. Gonzalez Becerra*, 784 F.3d 514, 518 (9th Cir. 2015) (holding that error cannot be plain where there is no controlling authority supporting the position). Accordingly, the district court did not plainly err in its determination that § 1346 applies to fraudulent bribery and kickback schemes that deprive patients of their intangible right to the honest services of their physicians.

## B.

Solakyan further argues that honest-services fraud requires the government to prove that the patient-victims suffered some kind of tangible harm, whether economic or otherwise, and that therefore the district court erred in failing

to instruct the jury on this element of the offense. While the Government counters that it presented evidence of actual harm at trial, Solakyan is correct that the district court never instructed the jury that proof of tangible harm was an element of honest-services fraud, and thus "the claim we consider here is one of instructional error, not of insufficiency of the evidence." *Riley v. McDaniel*, 786 F.3d 719, 725–26 (9th Cir. 2015). Reviewing Solakyan's preserved claim de novo, we conclude that actual or intended tangible harm is not an element of honest-services fraud.

*Milovanovic* is once again the starting point of our analysis. In the context of a public-sector fraud scheme, we held that "[f]oreseeable economic harm is not a necessary element when evaluating whether a party breached a fiduciary duty in violation of honest services fraud under §§ 1341 and 1346." *Id.* We instead "join[ed] the Second, Fifth, Eighth, and Tenth Circuits in adopting the 'materiality test.'" *Id.* at 726–27 (citing cases). That test requires "that the misrepresentation or omission at issue for an 'honest services' fraud conviction . . . be 'material,' such that the misinformation or omission would naturally tend to lead or is capable of leading a reasonable employer to change its conduct." *Id.* at 727 (quoting *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc)). Because *Milovanovic* "involve[d] honest services fraud committed against the public for which no economic damages need be shown," we left for another day the question "whether in a private sector case there might be a requirement [for] economic damages." *Id.*

The Government contends that we need not reach that question here because this is not a "purely" private-sector case. It reasons that workers' compensation fraud raises costs for the entire system and the fraud here indirectly

harmed one of California's agencies, the State Compensation Insurance Fund ("SCIF"). But the Government did not present this theory to the jury. The jury was instructed that the honest-services fraud counts were based on a fraudulent scheme to deprive patients of the honest services of their physicians, not a scheme to deprive the general public. That the State of California was indirectly harmed by the fraudulent scheme, along with private insurers, does not convert this case into a public-sector fraud case.[4]

Honest-services fraud generally rests on a triangular relationship between three parties: the offender, the betrayed party, and a third party involved in the bribery and kickback scheme. "While the offender profit[s], the betrayed party suffer[s] no deprivation of money or property; instead, a third party, who ha[s] not been deceived, provide[s] the enrichment." *Skilling*, 561 U.S. at 400. The paradigmatic example is "a city mayor (the offender) [who] accept[s] a bribe from a third party in exchange for awarding that party a city contract," in which the "contract terms [are] the same as any that could have been negotiated at arms length." *Id*. Even when the city (the betrayed party) suffers no "tangible loss" from this corrupt arrangement, "actionable harm [lies] in the denial of that party's right to the offender's 'honest services.'" *Id.*

Solakyan's prosecution concerned a fraud committed against private patients, not the State of California. The trial below established that Dr. Rigler (the offender) accepted

---

[4] In Solakyan's scheme, eight of the nine largest insurance victims were private insurers—the exception being the SCIF, a public enterprise fund created by the State of California in 1914 with partial autonomy from the state government.

bribes and kickbacks from Solakyan (the third party) in exchange for referring patients to Solakyan's diagnostic-screening companies to receive MRI scans. Patients (the betrayed party) were deprived of their physician's honest and loyal services because Dr. Rigler concealed that he had received money and other financial benefits in exchange for his MRI referrals, resulting in medically unnecessary treatment for many of his patients. Although the fraudulent scheme may have raised costs for the entire state workers' compensation system, and the SCIF was one of the insurers that reimbursed Solakyan for fraudulent diagnostic services, the State of California was never within the "triangle" comprising the honest-services fraud scheme. *Cf. Milovanovic*, 678 F.3d at 724 (observing State of Washington was allegedly deprived of defendants' honest services where state agency entrusted defendants to honestly and faithfully administer driving tests and certify test results). We reject the Government's invitation to construe this appeal as a public-sector fraud case under *Milovanovic*. *See id.* at 727.

We must therefore determine whether § 1346 requires the government to prove in a private-sector case that the victims of the fraudulent scheme suffered some kind of tangible harm as an element of the offense. The parties rely on competing circuit court decisions in support of their respective positions. Solakyan points to *United States v. Jain*, 93 F.3d 436 (8th Cir. 1996), a pre-*Skilling* decision which reversed a psychologist's conviction for honest-services fraud because the government failed to prove that his patients suffered tangible harm as a result of a fraudulent medical referral scheme. *Id.* at 441–42.

*Jain* acknowledged "that the literal language of § 1346 extends to private sector schemes to defraud another of the

right to 'honest services,'" but noted that the transition from public- to private-sector cases raised troubling concerns. *Id*. In a public bribery scheme, the "essence of the political contract is violated." *Id.* at 442. "But in the private sector," *Jain* reasoned, "most relationships are limited to more concrete matters. When there is no tangible harm to the victim of a private scheme, it is hard to discern what intangible 'rights' have been violated." *Id.* Because the court found "no evidence that any patient suffered tangible harm," the prosecution was required to show at least that Dr. Jain *intended* to cause his patients tangible harm. *Id*. at 441–42. Finally, the court concluded that Dr. Jain's failure to disclose the referral scheme to his patients was not "material" so as to constitute an intent to defraud because there was no evidence that the scheme "affect[ed] the quality or cost of his services to [any] patient." *Id.* at 442.

The Seventh Circuit flatly rejected this reasoning in *Nayak*, a post-*Skilling* decision which involved a patient-referral scheme similar to the one in *Jain* and this appeal. *See* 769 F.3d at 981–82. *Nayak*'s critique of *Jain* was twofold. First, the court found *Jain* unpersuasive "most notably because the proposed distinction between private and public corruption has no textual basis in § 1346." *Id.* at 982. Second, the Seventh Circuit concluded that *Jain* "is no longer good law" following *Skilling*. *Id. Jain* was "based on the premise that § 1346 does not apply to private corruption, and thus that the government must show tangible harm in a private corruption case." *Id*. But "*Skilling* tells us that § 1346 applies to this case." *Id.* Therefore, *Nayak* explained, "[Section] 1346 applies exclusively to the *intangible* right of honest services, so tangible harm need not be shown. Why would Congress specify (via § 1346) that § 1341 reaches schemes causing intangible harm if Congress

also meant to limit § 1341 only to schemes that result in tangible harm?" *Id.* *Nayak* thus held that "the government does not need to show tangible harm to a victim in an honest-services fraud case." *Id.*[5]

We are persuaded by *Nayak*'s reasoning, particularly in light of *Skilling.* In determining Congress's intent, we begin with the text of the statute. *Williams*, 441 F.3d at 722. Section 1346 does not require tangible harm; indeed, it provides for the opposite. *See* 18 U.S.C. § 1346 (stating that a "'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the *intangible* right of honest services" (emphasis added)); *see also Williams*, 441 F.3d at 720 ("Section 1346 thus codifies an 'intangible rights' theory of fraud. Under this theory, the object of the fraudulent scheme is the victim's intangible right to receive honest services."). *Jain*'s conclusion that in a private-sector prosecution for honest-services fraud the victim must suffer tangible harm cannot be squared with the plain text of § 1346.

Further, as *Skilling* made clear, the enactment of § 1346 was intended by Congress to reinstate the intangible-rights theory of fraud that *McNally* shuttered. *Skilling*, 561 U.S. at 404–05. This body of law included private-sector cases that preceded *McNally*. *Id.* at 401; *see also id.* at 413 n.45 (finding "§ 1346[] appli[es] to state and local corruption and to private-sector fraud"). As *Nayak* observed, "it is

---

[5] *Nayak* also rejected *Jain*'s conclusion that because the defendant did not intend to deprive his victims of anything tangible, there was no evidence of fraudulent intent. *See* 769 F.3d at 982. Dr. Jain "clearly did" intend "to deprive his patients of their intangible right to honest services," and therefore the "intent to cause intangible harm is sufficient to support the fraudulent intent element of the mail fraud statute." *Id.*

contradictory to require the government to show actual or intended *tangible* harm when the crime being prosecuted is defined as causing or intending to cause *intangible* harm." 769 F.3d at 982.  Solakyan's proposed construction would render § 1346 superfluous in private-sector cases, for fraudulent schemes that cause victims tangible harm such as the loss of money or property are already covered by mail or wire fraud statutes.  *See* 18 U.S.C. §§ 1341, 1343.

*Skilling* recognized that reading § 1346 as reaching "'*all* intangible rights of honest services whatever they might be thought to be,'" 561 U.S. at 405 (quoting *Rybicki*, 354 F.3d at 137–38), would raise due process vagueness concerns.  *Id.* at 408.  To resolve this problem, the Court construed the statute to reach only the "core" pre-*McNally* case law—public or private schemes to defraud that involved bribes and kickbacks.  *Id.* at 409.  Circuit courts have applied other limiting principles to address these due process concerns.  In *Milovanovic*, we articulated the following "six limitations to the conduct susceptible to prosecution under the otherwise broad reach of the Mail Fraud Statute" and § 1346: (1) there must be a legally based enforceable right to the service at issue; (2) the value of the particular service must depend on honest performance, free from fraud or deception; (3) deprivation of those services must be in breach of a formal or informal fiduciary duty; (4) the defendant must possess a specific intent to defraud; (5) the defendant must misrepresent or conceal a material fact; and (6) participants must use the "mails or wires" to further the scheme. *Milovanovic*, 678 F.3d at 726 (cleaned up).

None of the six limitations for public honest-services fraud prosecutions in this Circuit requires a showing of any tangible harm beyond the statutorily proscribed deprivation of the *intangible* right to honest services.  *See id.* at 726.

Between the bribery-and-kickback limitation imposed by *Skilling* and the six limitations imposed under *Milovanovic*, we see no textual or prudential basis to add such a requirement for private-sector fraud cases either.

We therefore hold that actual or intended tangible harm is not a necessary element for prosecution under §§ 1341 and 1346. Rather, the same elements required to prove honest-services fraud in a public-sector case, including fraudulent intent and materiality, apply in a private-sector case as well. *See id.* at 726, 728. Because the district court properly instructed the jury on the six elements for honest-services fraud under *Milovanovic*, we find no merit to Solakyan's challenges to his honest-services fraud convictions.

IV.

One of the two objects of the conspiracy charged under Count 1 was health-care fraud under 18 U.S.C. § 1347. Solakyan contends that the indictment failed to allege the requisite willfulness mens rea requirement for health-care fraud as an object of the conspiracy. *See* 18 U.S.C. § 1347 (imposing criminal liability on "[w]hoever knowingly and willfully executes" a fraudulent scheme involving a health-care benefit program). He contends that the indictment's total failure to recite an essential element of the charged offense requires automatic reversal under *United States v. Du Bo,* 186 F.3d 1177 (9th Cir. 1999).

Defects in the indictment must be raised before trial. Fed R. Crim. P. 12(b)(3); *see also Qazi*, 975 F.3d at 992 ("Pre-trial indictment challenges are reviewed de novo and post-trial challenges are reviewed for plain error."). The parties disagree whether Solakyan raised a timely pretrial challenge

to the sufficiency of the indictment.[6] We need not resolve
their dispute because even under a de novo standard of
review, we conclude that the indictment was sufficient on
this score.

This Court ordinarily reviews the sufficiency of an
indictment de novo. *United States v. Awad*, 551 F.3d 930,
935 (9th Cir. 2009). An indictment must be a "plain,
concise, and definite written statement of the essential facts
constituting the offense charged." Fed. R. Crim. P. 7(c)(1).
"An indictment is sufficient if it contains the elements of the
charged crime in adequate detail to inform the defendant of
the charge." *United States v. Kaplan*, 836 F.3d 1199, 1216
(9th Cir. 2016) (quoting *United States v. Buckley*, 689 F.2d
893, 896 (9th Cir. 1982)). In assessing the sufficiency of the
indictment, we "must look at the indictment as a whole,
include facts which are necessarily implied, and construe it
according to common sense." *Id.* "The test for sufficiency
of the indictment is 'not whether it could have been framed
in a more satisfactory manner, but whether it conforms to
minimal constitutional standards.'" *Awad*, 551 F.3d at 935
(quoting *United States v. Hinton*, 222 F.3d 664, 672 (9th Cir.
2000)).

---

[6] Solakyan filed multiple pretrial motions to dismiss the indictment that
did not raise this particular claim, then filed a "supplemental brief" that
challenged the indictment's failure to allege a "willfully/corruptly *mens
rea*" requirement for the honest-services charges. A portion of the brief
may suggest that the willfulness challenge was also directed at the
health-care fraud object of the conspiracy, but the district court struck
the supplemental brief as untimely and did not address the merits of the
claim. In post-trial briefing and argument, however, both the court and
the Government appeared to accept that Solakyan had raised the issue
before trial.

Another principle informs our review of Solakyan's claim. "The Supreme Court held many years ago that as long as the conspiracy itself is adequately alleged, a conspiracy indictment need not allege the offense that is the object of the conspiracy with the same precision as would be necessary where that offense is itself the crime charged." *United States v. Lo*, 231 F.3d 471, 481 (9th Cir. 2000) (citing *Wong Tai v. United States*, 273 U.S. 77, 81 (1927)). "In this Circuit and elsewhere, courts have relied upon *Wong Tai* to sustain indictments in which elements of the object offense have been not merely imprecisely stated but completely omitted." *United States v. Pheaster*, 544 F.2d 353, 360 (9th Cir. 1976).

We conclude that the indictment sufficiently informed Solakyan of the conspiracy charge predicated on health-care fraud as one of the objects of the conspiracy. While the indictment did not use the term "willfully," the facts of the indictment "signal[ed] unmistakably that Defendant acted with a bad purpose, which is the Supreme Court's definition of 'willfully.'" *Awad*, 551 F.3d at 937 (citation omitted). Those facts included numerous acts of concealment from patients and insurers; description of a bribery and kickback scheme as "corrupt"; description of Solakyan's services agreements with MedEx as a "sham"; an allegation that the co-conspirators intended to cause physicians to conceal the bribery and kickback payments from patients in violation of California law and in breach of the physicians' fiduciary duties; and an allegation that Defendant and his co-conspirators knew and intended that Dr. Rigler and other referring physicians would submit false statements to insurers that included false certifications of compliance with the California Labor Code.

These allegations of "conceal[ment]," "corrupt" scheming, "sham" financial arrangements, and submission of "false statements" plainly informed Solakyan that the Government asserted not only an intent to defraud but that he acted with a "bad purpose," knowing that his conduct was unlawful. *Awad*, 551 F.3d at 937. The indictment therefore did not completely fail to recite an essential element of the conspiracy charge so as to fall short of minimum constitutional standards. *See Lo*, 231 F.3d at 481 (requiring less precision a for conspiracy charge).

V.

Solakyan challenges the jury instructions on several other grounds: (1) flawed intent instructions as to the objects of the conspiracy, (2) deficient intent instructions for the mailing element of mail fraud, and (3) a constructive amendment in the attempt instructions.

A preserved challenge to a district court's formulation of jury instructions is reviewed for abuse of discretion. *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010). Harmless-error analysis applies to an instructional error "on a single element of the offense." *Neder v. United States*, 527 U.S. 1, 9 (1999). "Jury instructions are to be viewed as a whole, in context of the entire trial, to determine whether they were misleading or inadequate to guide the jury's determination." *United States v. Wood*, 943 F.2d 1048, 1052 (9th Cir. 1991).

A.

As to the health-care fraud object of the conspiracy, Solakyan argues that the district court's "knowingly" instruction fatally undermined the requisite "willfully" mens rea instruction for health-care fraud. We review Solakyan's

timely objection to the district court's intent jury instructions for abuse of discretion.  *Hofus*, 598 F.3d at 1174.

As noted above, the Government charged Solakyan in Count 1 with two objects of the conspiracy: conspiracy to commit honest-services mail fraud and health-care fraud.[7] Health-care fraud and mail fraud have different mens rea standards.  Health-care fraud requires proof that the defendant acted "willfully," i.e., that he knew his conduct was unlawful.  *See* 18 U.S.C. § 1347.  Mail fraud, on the other hand, does not.  *See* Ninth Cir. Model Crim. Jury Instr. No. 15.34 (stating that the government must prove that "the defendant devised or knowingly participated in a scheme or plan" and that "the defendant acted with the intent to defraud").  Thus, mail fraud does not require the Government to prove that a defendant knew his conduct was unlawful.  *See* 18 U.S.C. § 1347; Ninth Cir. Model Crim. Jury Instr. No. 4.8.

Because the indictment alleged different types of fraud with different mens reas as to the objects of the conspiracy, the district court gave a general instruction describing both mens rea elements:

> An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.  *The government is not required to prove that the defendant knew that his acts or omissions were unlawful*.  You may consider evidence of the defendant's words, acts, or omissions

---

[7] While the Government charged Solakyan with substantive honest-services mail fraud in Counts 2–12, it did not charge him with substantive health-care fraud in any count.

>along with all the other evidence, in deciding whether a defendant acted knowingly.

>An act is done willfully if the act is done intentionally with the bad purpose to disobey or to disregard the law.

Solakyan argues that the district court erred in its inclusion of the italicized sentence above because that portion of the instruction "should not be given when an element of the offense requires the government to prove that the defendant knew that what the defendant did was unlawful." *See* Ninth Cir. Model Crim. Jury Instr. No. 4.8 (cmt.). Because there was a separate "willfully" instruction as to the health-care fraud object of the conspiracy, he contends that "the conflicting [mens rea] definitions are impermissibly confusing to the jury." We disagree.

The mens rea instruction must be read in the context of other instructions given by the district court. For Count 1, the court explained that "the government has alleged that the defendant entered into a conspiracy to commit" two crimes, honest-services mail fraud and health-care fraud, and the court "will instruct you as to what the elements of those crimes are, so that you can understand the underlying crimes the government alleges defendant conspired to commit." In describing the mens rea element for health-care fraud, the court instructed, "[t]he crime of Health Care Fraud is committed when a perpetrator knowingly and willfully executes a scheme or plan to defraud a health care benefit program . . . . One must act with the intent to defraud."

Conversely, when the district court instructed the jury on the mens rea element for honest-services mail fraud, the court instructed that the Government must prove that "the

defendant devised or *knowingly* participated in a scheme or plan to deprive patients identified in each of these counts of their right to Dr. Rigler's honest services" and "the defendant acted with the specific intent to defraud by depriving the patients identified in that count of their right to Dr. Rigler's honest services." Read in context, the general mens rea instruction was not misleading or inadequate to guide the jury's deliberations because the jury was separately instructed on each object of the conspiracy, each with its own delineated mens rea requirement. The jury would have understood that it should apply the "willfully" instruction as to the health-care fraud object and apply "knowingly" as to the honest-services mail fraud object.[8]

The district court did not abuse its discretion in the formulation of its jury instructions regarding the health-care object of the conspiracy.

## B.

Solakyan argues that conviction for conspiracy to commit mail fraud requires a higher showing of intent than conviction for the underlying substantive offense of mail fraud. According to Solakyan, the district court erred when the court instructed the jury that "[a] mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use."

---

[8] We reject Solakyan's contention that the failure to define "intent to defraud" in its instruction on health-care fraud could have led the jury to convict Solakyan erroneously based on a mere "intent to deceive." The first element of the court's instruction stated that "[t]he crime of Health Care Fraud is committed when a perpetrator knowingly and willfully executes a scheme or plan to *defraud* a health care benefit program or *obtain money or property*" from such a program. There is no realistic possibility that the jury could convict on mere deception alone.

Solakyan timely objected to the district court's mens rea instruction for use of the mails on the conspiracy count.

Solakyan's argument is foreclosed under *United States v. Hubbard*, 96 F.3d 1223 (9th Cir. 1996). In *Hubbard,* we explained that a "specific intent to use the mails is not necessary to prove a substantive charge of mail fraud." *Id.* at 1229.

"Instead, if the defendant 'does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use *can reasonably be foreseen*, even though not actually intended, then he "causes" the mails to be used.'" *Id.* (emphasis added) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9 (1954)). The district court's instruction on mailings matched this Court's Model Jury Instruction 15.34.

A conspiracy to commit mail fraud does not require a higher showing of intent than the underlying substantive charge. *See Hubbard*, 96 F.3d at 1229 ("[A] federal conspiracy conviction does not require a greater level of criminal intent than a conviction on the substantive count."); *see also United States v. Smith*, 934 F.2d 270, 275 (11th Cir. 1991) ("[I]t is clear [under Supreme Court precedent] that proof of a specific intent to use the mails is not required to show conspiracy to commit mail fraud."). The district court did not abuse its discretion by including a "reasonably foreseeable" standard for use of the mails in its conspiracy instruction.

## C.

In his final challenge to the jury instructions, Solakyan argues that the district court's inclusion of an attempt instruction constituted a "constructive amendment" to the

charges and created a duplicity error that deprived him of his
constitutional right to a unanimous verdict.  Neither party
included an attempt instruction in their proposed jury
instructions, but the court, after conferring with the parties,
added an attempt instruction as to the substantive honest-
services mail fraud charges (Counts 2–12).  The Government
briefly referred to attempt in its closing rebuttal argument.

We review this claim for plain error because Solakyan
first asserted constructive amendment and duplicity in his
post-trial motions.  *See* Fed. R. Crim. P. 30(d); *United States
v. Hartz*, 458 F.3d 1011, 1019 (9th Cir. 2006) (applying
plain-error review for unpreserved claim of constructive
amendment).  Solakyan has not demonstrated any plain or
obvious error in the court's attempt instruction.  Federal Rule
of Criminal Procedure 31(c) provides that a "defendant may
be found guilty of . . . (1) an offense necessarily included in
the offense charged; (2) an attempt to commit the offense
charged; or (3) an attempt to commit an offense necessarily
included in the offense charged, if the attempt is an offense
in its own right."  Thus, a "defendant indicted only for a
completed offense can be convicted of attempt under Rule
31(c)."  *United States v. Resendiz-Ponce*, 549 U.S. 102, 110
n.7 (2007); *see also Simpson v. United States*, 195 F.2d 721,
723 (9th Cir. 1952) ("[T]he jury could, as it did, find
appellant guilty of the attempt, despite the fact that the
attempt was not expressly charged." (citing Fed. R. Crim. P.
31(c)); 18 U.S.C. § 1349 (criminalizing attempts to violate
§ 1341)).

Solakyan argues that the attempt instruction amounted to
a duplicity error that violated his right to a unanimous
verdict, given that the district court did not provide a
"specific unanimity instruction."  He argues that there is a
genuine possibility of juror confusion or that the jurors voted

to convict based on different theories: completed mail fraud or its attempt.  Even assuming the district court erred in failing to give a unanimity instruction, Solakyan has not demonstrated that such error affected his substantial rights or seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  *Puckett*, 556 U.S. at 135.  The evidence at trial overwhelmingly rested upon Solakyan's completed offenses and not upon attempt, namely his completed bribes to Dr. Rigler and subsequent mailing of requests for payment to insurers.  As the district court found, "[t]he crime was completed at the time of the mailing."  Solakyan has failed to show that any error "was highly prejudicial and there was a high probability that the error materially affected the verdict."  *United States v. Carr*, 761 F.3d 1068, 1083 n.10 (9th Cir. 2014) (quotation omitted).

## VI.

Finally, we review de novo a restitution order and the district court's valuation methodology.  *United States v. Gagarin*, 950 F.3d 596, 607 (9th Cir. 2020).  "If the order is within statutory bounds, then the restitution calculation is reviewed for abuse of discretion, with any underlying factual findings reviewed for clear error."  *Id.* (internal quotation marks and citation omitted).

Under the Mandatory Victims Restitution Act ("MVRA"), restitution is compulsory for "an offense against property . . . , including any offense committed by fraud or deceit."  18 U.S.C. § 3663A(c)(1)(A)(ii).  "Restitution is mandatory in this case, because we have recognized that § 3663A(c)(1)(A)(ii) applies to mail fraud, as prohibited by 18 U.S.C. § 1341."  *United States v. Thomsen*, 830 F.3d 1049, 1065 (9th Cir. 2016) (citing *United States v. Grice*,

319 F.3d 1174, 1177 (9th Cir. 2003)). "The purpose of restitution is to put the *victim* back in the position [it] would have been but for the defendant's criminal conduct." *United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010).

In determining restitution, a court must "order restitution to each victim in the full amount of each victim's losses as determined by the court." 18 U.S.C. § 3664(f)(1)(A); *see also id.* § 3663A(a)(1). "The amount of restitution is limited to the victim's 'actual losses' that are a direct and proximate result of the defendant's offense." *Thomsen*, 830 F.3d at 1065 (quoting *United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015)). In turn, a court calculates "actual losses" by determining "the difference between '(1) the loss [the victim] incurred because of the unlawful conduct, [and] (2) the loss the [victim] would have incurred had [defendant] acted lawfully.'" *Gagarin*, 950 F.3d at 607 (quoting *United States v. Bussell*, 504 F.3d 956, 965 (9th Cir. 2007)).

Solakyan asserts that the district court erred in ordering restitution of $27,937,175 because the amount deviated from the court's determination of loss under the United States Sentencing Guidelines Manual ("Guidelines"), and the court's calculation of loss was both procedurally and constitutionally flawed. He emphasizes that the restitution order cannot stand without any reduction for payments that the insurers would have made for medically necessary MRIs in the absence of fraud. We take each contention in order.

A.

At sentencing and following an evidentiary hearing on loss, the district court found that the prima facie intended loss amount was $263 million—the aggregate amount Solakyan *billed* insurers in the California workers' compensation system for MRI scans referred to his

diagnostic clinics during the relevant time period. The Government then sought restitution of $27,937,175—the amount that the nine largest insurers *paid* to Solakyan's entities for those MRIs. The Government argued that it was not seeking deductions or offsets from that loss amount because the MRIs would not have been conducted but for the fraud. That is, "the referrals would *not* have been made, nor would the MRIs have been performed[,] absent the cross-referral scheme." The district court ordered restitution of $27,937,175 under the MVRA as "the amount that the nine largest workers' compensation insurers paid out to the Solakyan entities for MRIs referred by the [cross-referral] network of doctors."

For sentencing purposes under the Guidelines, the court adopted the Government's more conservative loss amount of $4.4 million. Sentencing Guideline application note 3(E) instructs the court that any loss "shall be reduced" by the fair market value of services rendered. U.S.S.G. § 2B1.1 cmt. 3(E)(i). The district court deducted the fair market value of MRIs that could have been deemed medically necessary by applying more conservative estimates, such as (1) evaluating MRIs performed only from 2013 to 2015; (2) including only patients who received four or more MRIs; (3) using conservative MRI reimbursement rates; and (4) offsetting MRIs within the narrowed pool that were deemed medically necessary.

This brings us to Solakyan's claim that the court erred in ordering a restitution amount that is distinct from the loss amount calculated for purposes of sentencing. The district court did not err. As we recently stated, "[t]here is no categorical rule that restitution must be equal to or less than the amount of loss found when applying Sentencing Guidelines § 2B1.1(b)(1) or similar loss-based Guidelines

sections." *United States v. Dadyan*, 76 F.4th 955, 959 (9th Cir. 2023). "A discrepancy, standing alone, does not establish legal error." *Id.* at 960. Accordingly, a court's leniency on the loss calculation for sentencing purposes does not hamstring its discretion to impose a larger restitution order in an amount fully borne by a defendant's victims.

## B.

While the district court may apply an independent analysis to calculate restitution, the court must make specific findings that justify the restitution award. In *United States v. Dokich*, the Seventh Circuit reviewed a defendant's challenge to a restitution order and noted that the district court used a higher loss amount for restitution than it did for the Guidelines calculation. 614 F.3d 314, 319 (7th Cir. 2010). The court affirmed the district court's larger restitution order because "[n]othing about the district court's decision to give [the defendant] a slightly lower term of imprisonment casts doubt on the fact that the court made a specific finding about the actual loss that [the defendant's] fraudulent operations caused." *Id.* at 320.

Ordering restitution in the amount which the insurers paid Solakyan's entities was "within statutory bounds," *see Gagarin*, 950 F.3d at 607, but we conclude that the district court abused its discretion in ordering $27,937,175 without making specific findings as to why offsets should not apply. Under this Court's "actual loss" rule for restitution, actual loss equals the total loss incurred minus any "loss the [victim] would have incurred had the [defendant] acted lawfully." *Id.* (quoting *Bussell*, 504 F.3d at 965). The Government argues that had Solakyan "acted lawfully" and not created his illicit cross-referral scheme: (1) medical providers would not have generated the MRI orders for

uninsured patients that were routed to Solakyan; (2) Solakyan would not have been able to file the volume of liens he did with insurers; and (3) the insurers would not have issued any payments to Solakyan to settle the liens. In other words, "the insurers suffered losses in the amount of the payments they made to defendant for liens arising from the scheme and are entitled to restitution in that amount."

The Government's arguments have certain force, but the district court never explained why it did not deduct from the restitution order the value of medically necessary MRIs. This Court's actual loss rule requires deducting from the total restitution amount the value of services for which insurers would have paid, absent Solakyan's fraud. *See Gagarin*, 950 F.3d at 607. Such deductions include any medically necessary and otherwise lawful MRIs had the patients been insured—an analysis that the Government made and the court accepted for determining the "conservative" loss amount under the Sentencing Guidelines. We hold that the district court's failure to make specific findings supporting its restitution amount, in particular as to offsets, was an abuse of discretion.

## VII.

We affirm Solakyan's conviction but vacate the restitution order and remand to the district court to determine whether the total loss amount should be reduced, at least in part, by the cost of reimbursement for medically necessary MRIs the insurers would have incurred had Solakyan acted lawfully.

Defendant's conviction **AFFIRMED**. Restitution order **VACATED** and **REMANDED**.